COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
JEFFREY W. HERRMANN
Park 80 West-Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
201-845-9600
201-845-9423
jwh@njlawfirm.com

*Attorneys for Plaintiffs*

LAW OFFICE OF RICHARD S. CORNFELD

    Richard S. Cornfeld
    1010 Market Street, Suite 1720
    St. Louis, MO  63101
    (314) 241-5799
    (314) 241-5788 (fax)
    rcornfeld@cornfeldlegal.com

and

THE SIMON LAW FIRM, P.C.

    John G. Simon
    Ryan A. Keane
    800 Market Street, Suite 1700
    St. Louis, MO 63101
    (314) 241-2929
    (314) 241-2029 (Fax)
    jsimon@simonlawpc.com
    rkeane@simonlawpc.com

and

AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC

    Douglass Alan Kreis
    E. Samuel Geisler
    17 East Main Street, Suite 200
    Pensacola, Florida  32502-5996
    (850) 202-1010
    (850-916-7449 (Fax)
    dkreis@awkolaw.com
    SGeisler@awkolaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

LEONARD COTTRELL, SANDRA HENON,
WILLIAM REEVES, GEORGE HERMAN,
SIMON NAZZAL, CAROL FREBURGER,
JACK LIGGETT, PATRICIA BOUGH, MACK
BROWN, DOLORES GILLESPIE, DEBORAH
HARRINGTON, ROBERT INGINO,
EDWARD ROGERS, JR., DEBORAH
 RUSIGNULOLO, DOROTHY STOKES,
JOSEPHINE TROCCOLI, HURIE WHITFIELD,
THOMAS LAYLOFF, CAROLYN TANNER,
PATSY TATE, JOHN SUTTON, JESUS
RENTERIA, GLENDELIA FRANCO and
NADINE LAMPKIN


on behalf of themselves
and all others similarly situated,

      Plaintiffs,

v.                                                              Civil Action No.

ALCON LABORATORIES, INC.; ALCON
RESEARCH, LTD.; FALCON                       **CLASS ACTION COMPLAINT**
PHARMACEUTICALS, Ltd.; SANDOZ, INC.;
ALLERGAN, INC.; ALLERGAN USA, INC.;
ALLERGAN SALES, LLC; PFIZER INC.;             JURY DEMAND
VALEANT PHARMACEUTICALS
INTERNATIONAL, INC.; BAUSCH AND
LOMB INCORPORATED; ATON PHARMA,
INC.; MERCK & CO., INC.; MERCK, SHARP
& DOHME CORP., PRASCO, LLC, and
AKORN, INC.

      Defendants.

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

THE PARTIES ................................................................................................................... 6

    New Jersey Plaintiffs ................................................................................................ 6

    California Plaintiffs ................................................................................................... 6

    Florida Plaintiffs ...................................................................................................... 7

    Illinois Plaintiff ....................................................................................................... 9

    North Carolina Plaintiffs ......................................................................................... 9

    Texas Plaintiffs ...................................................................................................... 10

    The Alcon Defendants ........................................................................................... 10

    The Allergan Defendants ....................................................................................... 11

    Pfizer ...................................................................................................................... 12

    The Valeant Defendants......................................................................................... 12

    The Merck Defendants ........................................................................................... 13

    Prasco ..................................................................................................................... 14

    Akorn ..................................................................................................................... 14

JURISDICTION AND VENUE ....................................................................................... 15

FACTUAL ALLEGATIONS REGARDING DEFENDANTS' LIABILITY ................... 15

    The Amount of Medication That the Eye Can Absorb Is Limited by the Eye's Capacity ....... 16

    Equivalence of Effectiveness of Larger and Smaller Eye Drops............................... 18

    Larger Eye Drops Present a Greater Risk of Systemic Side Effects Compared to Smaller Drops........................................................................................................... 21

    The Scientific Literature States That Drops Should Be No Larger Than 15 μL ..................... 24

    Defendants' Eye Drops Are Much Larger Than 15 μL ......................................... 27

    Large Eye Drops Cause Substantial Injuries to Consumers ...................................... 33

i

Consumers Could Not Reasonably Have Avoided This Injury .................................................. 36

There Are No Countervailing Benefits from Eye Drops that Are Larger than the Capacity of
the Eye ............................................................................................................................................... 37

The Sizes of Defendants' Eye Drops Are Within Their Control ............................................... 37

Other Factors that Might Influence the Size of Eye Drops Do Not Prevent Defendants from
Reducing the Sizes of their Eye Drops ...................................................................................... 40

The FDA Does Not Prevent Defendants from Changing the Size of Eye Drops .................... 42

CLASS ACTION ALLEGATIONS: ............................................................................................. 49

DEFENDANTS' ACTIONS ARE UNFAIR UNDER THE FTC'S INTERPRETATION OF
SECTION 5(a) OF THE FTC ACT .............................................................................................. 58

VIOLATION OF THE New Jersey Consumer Fraud Act ........................................................... 61

VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW .................................. 62

VIOLATIONS OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ........ 63

VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT .................................................. 64

VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE
PRACTICES Act ............................................................................................................................. 65

VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT .............................. 66

COUNT I:  ALCON'S VIOLATIONS OF NJCFA ..................................................................... 68

COUNT II:  ALLERGAN'S VIOLATIONS OF NJCFA ............................................................ 69

COUNT III:  PRASCO'S VIOLATIONS OF NJCFA ................................................................. 70

COUNT IV:  MERCK'S VIOLATIONS OF NJCFA .................................................................. 71

COUNT V:  ALCON'S VIOLATIONS OF THE CALIFORNIA UCL ...................................... 72

COUNT VI:  ALLERGAN'S VIOLATIONS OF THE CALIFORNIA UCL ............................ 74

COUNT VII:  PFIZER'S VIOLATIONS OF THE CALIFORNIA UCL ................................... 75

COUNT VIII:  VALEANT DEFENDANTS' VIOLATIONS OF THE CALIFORNIA UCL .... 76

COUNT IX:  MERCK'S VIOLATIONS OF THE CALIFORNIA UCL ................................... 78

COUNT X:  AKORN'S VIOLATIONS OF THE CALIFORNIA UCL ..................................... 79

COUNT XI:  ALCON'S VIOLATIONS OF FDUTPA ................................................................ 81

COUNT XII:  ALLERGAN'S VIOLATIONS OF FDUTPA ...................................................... 82

COUNT XIII:  PFIZER'S VIOLATIONS OF FDUTPA ............................................................ 84

COUNT XIV:  THE VALEANT DEFENDANTS' VIOLATIONS OF FDUTPA .................... 85

COUNT XV:  MERCK'S VIOLATIONS OF FDUTPA ............................................................ 86

COUNT XVI:  PRASCO'S VIOLATIONS OF FDUTPA ........................................................ 88

COUNT XVII:  AKORN'S VIOLATIONS OF FDUTPA ........................................................ 89

COUNT XVIII:  ICFA VIOLATIONS OF ALCON .................................................................. 90

COUNT XIX:  ICFA VIOLATIONS OF PFIZER .................................................................... 91

COUNT XX:  ALCON'S VIOLATIONS OF NCUDTPA ........................................................ 92

COUNT XXI:  ALLERGAN'S VIOLATIONS OF NCUDTPA ................................................ 94

COUNT XXII:  PFIZER'S VIOLATIONS OF NCUDTPA ...................................................... 95

COUNT XXIII:  ALCON'S VIOLATIONS OF THE TEXAS DTPA ...................................... 96

COUNT XXIV:  ALLERGAN'S VIOLATIONS OF THE TEXAS DTPA .............................. 97

COUNT XXV:  VALEANT DEFENDANTS' VIOLATIONS OF THE TEXAS DTPA ........... 99

PRAYER FOR RELIEF ......................................................................................................... 100

JURY DEMAND ................................................................................................................... 1001

PLAINTIFFS LEONARD COTTRELL, SANDRA HENON, WILLIAM REEVES, ,
GEORGE HERMAN, SIMON NAZZAL, CAROL FREBURGER, JACK LIGGETT,
PATRICIA BOUGH, MACK BROWN, DELORES GILLESPIE, DEBORAH HARRINGTON,
ROBERT INGINO, EDWARD ROGERS, JR., DEBORAH RUSIGNULOLO, DOROTHY
STOKES, JOSEPHINE TROCCOLI, HURIE WHITFIELD, THOMAS LAYLOFF, CAROLYN
TANNER, PATSY TATE, JOHN SUTTON, JESUS RENTERIA, GLENDELIA FRANCO and
NADINE LAMPKIN ("Plaintiffs"), on behalf of themselves complain against Defendants Alcon
Laboratories, Inc.; Alcon Research, Ltd.; Falcon Pharmaceuticals, Ltd.; Sandoz, Inc.;[1] Allergan,
Inc.; Allergan USA, Inc.; Allergan Sales, LLC.;[2] Pfizer Inc. ("Pfizer"); Valeant Pharmaceuticals
International, Inc. ("Valeant"); Bausch and Lomb Incorporated ("B+L"); Aton Pharma, Inc.
("Aton");[3] Merck & Co., Inc.; Merck, Sharp & Dohme Corp.[4]; Prasco, LLC ("Prasco"); and
Akorn, Inc. ("Akorn") (collectively "Defendants"), as follows based on personal knowledge as to
their own actions and on information and belief as to Defendants' conduct and practices:

## INTRODUCTION

1.      Plaintiffs bring this class action individually and on behalf of Classes of persons
and entities (referred to herein collectively as "Class Members," or "Classes") who or which
have paid all or part of the purchase prices of prescription eye drops manufactured and sold by
Defendants and who or which were compelled by Defendants' unfair and illegal practices to pay
for much more medication than the users of those medications needed.

[1] Alcon Laboratories, Inc.; Alcon Research, Ltd.: Falcon Pharmaceuticals, Ltd.; and Sandoz, Inc. are collectively
referred to herein as "Alcon."

[2] Allergan, Inc.; Allergan USA, Inc.; and Allergan Sales, LLC. are collectively referred to herein as "Allergan."

[3] Valeant, B+L, and Aton are collectively referred to as "Valeant Defendants."

[4] Merck, Sharpe & Dohme Corp. and Merck & Co., Inc., are collectively referred to herein as "Merck."

1

2.     Prescription eye drops, also known as "topical ophthalmic pharmaceuticals," constitute a multi-billion dollar industry in the United States.  Millions of Americans, including Plaintiffs and many other consumers, take these expensive medications pursuant to doctors' prescriptions for serious diseases and conditions such as glaucoma, allergies, infections, inflammations, pre- and post-operative conditions, and others.

3.     These patients are entitled to receive the full use and therapeutic benefit of the entire product they purchase.  Yet because of the Defendants' illegal schemes to increase their profits at consumers' expense, patients are compelled to purchase larger quantities that, through no fault of their own, go to waste, and as a result they and their third-party payors pay much more than they should for the treatment they need.

4.     Defendants sell their prescription eye drop products as fluid in plastic bottles. They sell a given volume of medication (*e.g*., 2.5 or 5.0 mL) for a certain price, without stating how many doses are contained in the bottles or how many days they will last.

5.     A wealth of scientific literature spanning the past several decades establishes that these bottles, which also serve as dispensers, emit drops so large that they exceed the capacity of the fornix, the area between the eye and the lower eyelid.  As a result, and as that literature likewise shows, much or most of the medication runs down the patient's cheeks, where it can cause allergy or pigmentation, or drains into their nasolacrimal drainage systems and from there into the bloodstream where it can create a risk of toxic side effects.  By Defendants' design, the excess product cannot be used, is entirely wasted, provides no pharmaceutical benefit, and is often harmful.

6.     Much of this literature was published or supported by these Defendants.  For example, twenty years ago, scientists from Defendant Alcon Laboratories, Inc., joined with

2

scientists from Johns Hopkins School of Medicine in a double-blind study using dropper tips that emitted drops of only 16 μL (microliters, or a millionth of a liter).  They found those drops to have the same therapeutic benefit as 30 μL drops but were better tolerated, and they published the results in a peer-reviewed paper in the American Journal of Ophthalmology.[5]  Yet Alcon has never sold prescription eye drops that are as small as 16 μL.  In fact, following publication of this study, Alcon marketing executives told the article's senior author, Dr. Alan Robin, that Alcon would not reduce the drop size of its products because it would mean that patients would be able to use the bottles longer and Alcon would therefore sell less product.

7.      In a scientific article published in the peer-reviewed Journal of Ocular Pharmacology and Therapeutics in 2006, scientists from Defendant Allergan, Inc., along with co-authors from the University of Chicago, set forth in three sentences the factual and scientific basis for this lawsuit:

> Studies have shown that the bioavailability and efficacy of drops as small as 15 μL are equivalent to those of larger drops.  Therefore, smaller drops would be preferable to minimize systemic exposure and spilled or wasted medication. Obviously, a smaller drop size would mean that more doses could be dispensed from each bottle of medication, providing cost savings to patients and managed care providers.[6]

8.      Again in 2011, one of these Allergan scientists, writing in the medical e-book *Glaucoma – Current Clinical and Research Aspects*, reaffirmed those principles:  "Smaller size drops on the order of 15 μL, have an efficacy and bioavailability equivalent to larger drops,

---

[5] Mark J. Vocci et al., *Reformulation and Drop Size of Apraclonidine Hydrochloride*, 113 Am. J. Ophthalmology 154, 160 (1992)

[6] Richard Fiscella *et al.*, *Efficiency of Instillation Methods for Prostaglandin Medications*, 22 J. Ocular Pharmacology and Therapeutics 477, 478 (2006).

without the waste.  In fact, drops of this size are preferable, as they minimize systemic exposure and wastage."[7]

9.    Yet Defendants' eye drops are uniformly much larger than 15 μL.  Some are more than three times that size.

10.    There is no legitimate reason why Defendants have not supplied smaller eye drops.  As they have long known, the size of the drop is determined by a factor under their control, the dimensions of the plastic dropper tip.  More than a quarter century ago, eye doctors created dropper tips in the laboratory that emitted drops of 11 and 19 μL and published the tip dimensions in the American Journal of Ophthalmology, a peer-reviewed scientific journal.[8]

11.    Yet Defendants have persisted in their unfair, unethical, unconscionable, and unlawful practices of selling prescription ophthalmic medicine in dispensers that emit much larger eye drops.  As a result, consumers use more medication than they should, run out of medicine before they should, and have to buy additional bottles at great expense, providing increased, but unfair, unethical and unconscionable profits for Defendants.

12.    What makes the actions of Defendants even worse is the seriousness of the diseases that their medications treat.  For example, glaucoma, which is caused by an increased pressure inside the eye, is the leading cause of blindness in blacks and Hispanics and the second-leading cause in whites.  It disproportionately affects the elderly on fixed incomes.  Some of the consequences of glaucoma include the inability to drive, recognize faces, walk, maintain balance, and read.  According to Allergan, it afflicts more than a million-and-a-half Americans.  The only

---

[7]J. Walt and F. Alexander, "Drops, Drops, and More Drops," in Glaucoma – Current Clinical and Research Aspects, (P. Gunvant ed. 2011) at 208.

[8]Brown, Reay H. et al., *Creating Smaller Eyedrops by Reducing Eyedropper Tip Dimensions*, 99 Am. J. Ophthalmology 460-464 (1985).

successful therapy for glaucoma is to lower the eye's pressure.  Other than prescription eye drops, there is no commercially available medication to accomplish this outcome and no commercially available delivery device for this medication other than the eye drop dispensers in which these medications are sold.  Once diagnosed with the disease, patients need to take their eye drops every day for the rest of their lives at an annual cost of many hundreds or even thousands of dollars.

13.     Moreover, the excess portion of the drops that drains through the lacrimal duct ultimately enters the bloodstream without first undergoing metabolic inactivation in the liver.  This can lead to a risk of side effects such as decreased cardiovascular response to exercise, lowered blood pressure and emotional or psychiatric effects.

14.     In addition, the size of the drops is so large that it can lead to an additional health risk for these patients by contributing to a situation in which they run out of their medication before their insurer or other third-party payor will reimburse them for a replacement bottle.  Because these drugs are so expensive, many patients cannot afford to buy the drugs without reimbursement from their third-party payor and, therefore, go without, placing them at increased risk of loss of vision or complete blindness.

15.     It is manifestly unfair for Defendants to sell products that are sold in a way that compels consumers to buy unneeded amounts and that thereby also creates a risk of harm.  Both aspects – the forced purchase of unneeded amounts and the creation of unwarranted health and safety risks – render Defendants' practices unfair under the policy of the Federal Trade Commission, which has been incorporated into the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201 et seq., and similar statutes of California, Illinois, New Jersey, North Carolina and Texas.

16.     For all these reasons, Defendants' practices of selling topical prescription ophthalmic pharmaceuticals are unfair, unethical and unconscionable and violate FDUTPA, and similar statutes of other states.

17.     Plaintiffs bring this lawsuit on behalf of themselves and proposed Classes of similarly situated consumers and third-party payors who paid all or part of the purchase price of multi-dose bottles of prescription eye drops manufactured by Defendants.  Plaintiffs seek to redress Defendants' illegal conduct and to recover as damages the excessive costs for inherently wasted medication manufactured and sold by Defendants, as well as punitive damages.

## THE PARTIES

### New Jersey Plaintiffs

18.     Plaintiff Leonard Cottrell is a resident of Bayville, New Jersey.  During the period encompassed by the applicable statute of limitations, Mr. Cottrell purchased and used Travatan Z prescription eye drops manufactured and sold by Alcon.

19.     Plaintiff Sandra Henon is a resident of Pennsauken Township, New Jersey. During the period encompassed by the applicable statute of limitations, Ms. Henon purchased and used Travatan Z prescription eye drops manufactured and sold by Alcon.

20.     William Reeves is a resident of Voorhees, New Jersey.  During the period encompassed by the applicable statute of limitations, Mr. William Reeves purchased and used Lumigan prescription eye drops manufactured and sold by Allergan and Dorzolamide-Timolol prescription eye drops manufactured by Merck and sold by Prasco.

### California Plaintiffs

21.     Plaintiff George Herman is a resident of Calabasas, California.  During the period encompassed by the applicable statute of limitations, Mr. Herman purchased and used Azopt and Vigamox prescription eye drops manufactured and sold by Alcon; Alphagan P and Combigan

prescription eye drops manufactured and sold by Allergan, Lotemax prescription eye drops manufactured and sold by Valeant Defendants, Cosopt prescription eye drops manufactured and sold by Merck and Latanoprost prescription eye drops manufactured and sold by Akorn.

22.     Simon Nazzal is a resident of San Bernardino, California.  During the period encompassed by the applicable statute of limitations, Mr. Nazzal purchased Xalatan prescription eye drops manufactured and sold by Pfizer.

### Florida Plaintiffs

23.     Plaintiff Carol Freburger is a resident of Aventura, Florida.  Ms. Freburger purchased and used Lumigan and Alphagan P prescription eye drops manufactured and sold by Allergan during the period encompassed by the applicable statute of limitations.

24.     Plaintiff Jack Liggett is a resident of Palm Beach Gardens, Florida. Dr. Liggett purchased and used Travatan Z prescription eye drops manufactured and sold by Alcon, Combigan prescription eye drops manufactured and sold by Allergan, and Timoptic-XE prescription eye drops manufactured and sold by Aton and Merck during the period encompassed by the applicable statute of limitations.

25.     Plaintiff Patricia Bough is a resident of Vero Beach, Florida.  Ms. Bough purchased and used Travatan Z prescription eye drops manufactured and sold by Alcon, Alphagan P prescription eye drops manufactured and sold by Allergan, and Dorzolamide/Timolol prescription eye drops manufactured by Merck and sold by Prasco during the period encompassed by the applicable statute of limitations.

26.     Plaintiff Mack Brown is a resident of Ft. Lauderdale, Florida.  Mr. Brown purchased and used Lumigan and Alphagan P prescription eye drops manufactured and sold by Allergan and Cosopt prescription eye drops manufactured and sold by Merck during the period encompassed by the applicable statute of limitations.

27.     Plaintiff Dolores Gillespie is a resident of Sarasota, Florida.  Ms. Gillespie purchased and used Timolol Maleate prescription eye drops manufactured and sold by Alcon, Xalatan prescription eye drops manufactured and sold by Pfizer, and Latanoprost prescription eye drops manufactured and sold by Valeant Defendants during the period encompassed by the applicable statute of limitations.

28.     Plaintiff Deborah Harrington is a resident of Deerfield Beach, Florida.  Ms. Harrington purchased and used Travatan Z prescription eye drops manufactured and sold by Alcon, and Timolol Maleate prescription eye drops manufactured and sold by Akorn, during the period encompassed by the applicable statute of limitations.

29.     Plaintiff Robert Ingino is a resident of Port St. Lucie, Florida.  Mr. Ingino purchased and used Travatan Z and Azopt prescription eye drops manufactured and sold by Alcon and Alphagan P prescription eye drops manufactured and sold by Allergan during the period encompassed by the applicable statute of limitations.

30.     Plaintiff Edward Rogers Jr. is a resident of Vero Beach, Florida.  Mr. Rogers purchased and used Travatan Z prescription eye drops manufactured and sold by Alcon during the period encompassed by the applicable statute of limitations.

31.     Plaintiff Deborah Rusignulolo is a resident of Fort Pierce, Florida.  Ms. Rusignulolo purchased and used Travatan Z and Brimonidine prescription eye drops manufactured and sold by Alcon, Alphagan P prescription eye drops manufactured and sold by Allergan, Brimonidine prescription eye drops manufactured and sold by Valeant Defendants, Dorzolamide/Timolol prescription eye drops manufactured by Merck and sold by Prasco, and Brimonidine prescription eye drops manufactured and sold by Akorn during the period encompassed by the applicable statute of limitations.

32.     Plaintiff Dorothy Stokes is a resident of Vero Beach, Florida.  Ms. Stokes purchased and used Travatan Z and Latanoprost prescription eye drops manufactured and sold by Alcon and Combigan prescription eye drops manufactured and sold by Allergan during the period encompassed by the applicable statute of limitations.

33.     Plaintiff Josephine Troccoli is a resident of Plantation, Florida.  Ms. Troccoli purchased and used Lumigan prescription eye drops manufactured and sold by Allergan and Cosopt prescription eye drops manufactured and sold by Merck, during the period encompassed by the applicable statute of limitations.

34.     Plaintiff Hurie Whitfield is a resident of Lake Park, Florida.  During the period encompassed by the applicable statute of limitations, Mr. Whitfield purchased and used Lumigan and Alphagan P prescription eye drops manufactured and sold by Allergan and Istalol prescription eye drops manufactured by B+L for Ista Pharmaceuticals ("Ista") and sold by Ista.

### Illinois Plaintiff

35.     Plaintiff Thomas Layloff is a resident of Granite City, Illinois.  Dr. Layloff purchased and used Azopt prescription eye drops manufactured and sold by Alcon and Xalatan prescription eye drops manufactured and sold by Pfizer during the period encompassed by the applicable statute of limitations.

### North Carolina Plaintiffs

36.     Plaintiff Carolyn Tanner is a resident of Fayetteville, North Carolina.  During the period encompassed by the applicable statute of limitations, Ms. Tanner purchased and used Lumigan prescription eye drops manufactured and sold by Allergan.

37.     Plaintiff Patsy Tate is a resident of Eden, North Carolina.  During the period encompassed by the applicable statute of limitations, Ms. Tate purchased and used Travatan and Travatan Z prescription eye drops manufactured and sold by Alcon.

9

38.     John Sutton is a resident of Elizabeth City, North Carolina.  During the period encompassed by the applicable statute of limitations, Mr. Sutton purchased and used Xalatan prescription eye drops manufactured and sold by Pfizer.

## Texas Plaintiffs

39.     Jesus Renteria is a resident of Edinburg Texas.  During the period encompassed by the applicable statute of limitations, Mr. Renteria purchased and used Travatan Z and Simbrinza prescription eye drops manufactured and sold by Alcon.

40.     Glendelia Franco is a resident of Houston, Texas.  During the period encompassed by the applicable statute of limitations, Ms. Franco purchased and used Lumigan prescription eye drops manufactured and sold by Allergan.

41.     Nadine Lampkin is a resident of Palestine, Texas.  During the period encompassed by the applicable statute of limitations, Ms. Lampkin purchased and used Latanoprost prescription eye drops manufactured and sold by Valeant Defendants.

## The Alcon Defendants

42.     Three of the Alcon Defendants, Alcon Laboratories, Inc.; Alcon Research, Ltd.; and Falcon Pharmaceuticals, Ltd., are corporations incorporated under the laws of Delaware with their principal place of business at 6201 S. Freeway, Fort Worth, TX 76134.   The fourth, Sandoz, Inc., is a corporation incorporated under the laws of Delaware with its principal place of business at 59 Route 10, East Hanover, N.J. 07936.

43.     Defendant Alcon Laboratories, Inc., performs selling, marketing and distribution activities in the United States for Alcon's prescription eye drop products.  Defendant Alcon Research, Ltd., is responsible for Alcon's U.S. manufacturing and research and development operations for Alcon's prescription eye drop products.  Falcon Pharmaceuticals, Ltd., manufactures and, until on or about April 2011, marketed and sold Alcon's generic ophthalmic

10

products in the United States.  Since on or about April 2011, Sandoz Inc. has marketed and sold

Alcon's generic ophthalmic products in the United States.

44.     The following table lists Alcon's principal topical ophthalmic pharmaceutical

products sold in multi-dose containers during the applicable class periods:

| Glaucoma | Ocular Anti-Infectives/ Anti-Inflammatories | Ocular Allergy | Generics |
|----------|---------------------------------------------|----------------|----------|
| *Travatan* | *Vigamox* | *Patanol* | Timolol |
| *Travatan Z* | *Moxeza* | *Pataday* | Timolol GFS |
| *Azopt* | *Nevanac* | | Betaxolol |
| *Betoptic* | *TobraDex* | | Carteolol |
| *Betoptic S* | *TobraDex ST* | | Apraclonidine |
| *Simbrinza* | *Maxitrol* | | Latanoprost |
| *Iopidine* | *Durezol* | | Levobunolol |
| | | | Metipranolol |
| | | | Pilocarpine |
| | | | Prednisolone Acetate |
| | | | Dorzolamide |
| | | | Dorzolamide/Timolol |
| | | | Ciprofloxacin |
| | | | Brimonidine Tartrate |
| | | | Trifluridine |
| | | | Tobramycin/ Dexamethasone |

**The Allergan Defendants**

45.     Two of the Allergan Defendants, Allergan, Inc. and Allergan USA, Inc., are

corporations incorporated under the laws of Delaware with their principal place of business at

2525 Dupont Drive, Irvine, California 92612.  The third, Allergan Sales, LLC, is a California

limited liability corporation with its principal place of business at the same address.

46.     During the applicable class periods, Allergan manufactured and sold prescription

eye drop products in multi-dose containers as listed below for the following conditions:

      A.     **Glaucoma.**  Lumigan, Alphagan, Alphagan P, Combigan, and Betagan.

      B.     **Allergy.**  Acular, Alocril, Elestat and Lastacaft.

      C.     **Inflammation.**  Acular LS and Pred Forte.

      D.     **Infection.**  Zymar and Zymaxid.

11

**Pfizer**

47.     Pfizer is a corporation incorporated under the laws of Delaware with its principal place of business at 225 E. 42nd Street, New York, NY 10017.

48.     Pfizer's principal prescription eye drop product sold in multi-dose containers is the glaucoma drug Xalatan.  Until Xalatan lost its exclusivity in March 2011, it was the largest selling prescription eye drop in the United States and is still widely sold.

**The Valeant Defendants**

49.     Valeant is a corporation organized under the laws of Canada, with its principal place of business at 4787 Levy Street, Montreal, Quebec, Canada H4R 2P9.  Its U.S. Headquarters are at 700 Route 202/206, Bridgewater, NJ 08807.

50.     B+L is a corporation incorporated under the laws of New York with its principal place of business at Bausch & Lomb Place, Rochester NY 14604.  On August 5, 2013, Valeant completed its acquisition of B+L.  According to information on Valeant's web site, "Valeant's existing ophthalmology businesses have been integrated into the Bausch + Lomb division to create a global eye health platform."[9]  In or about July 2013, Valeant announced that it was moving B+L's principal place of business to Bridgewater, NJ.

51.     Aton Pharma, Inc., is a corporation incorporated under the laws of Delaware with its principal place of business located in Lawrenceville, New Jersey. Valeant completed its acquisition of Aton on May 27, 2010.

52.     The prescription eye drops of Valeant's B+L unit that are sold in multi-dose containers include Besivance (an anti-bacterial); Optipranolol, Brimonidine, Dorzolamide, Timolol Maleate and Levobunolol (glaucoma); Lotemax and Zylet (steroid anti-inflammatories)

---

[9] http://www.valeant.com/about/acquisition-faqs (accessed December 5, 2013).

and Alrex (allergy).  In or about June 2012, B+L acquired and succeeded to Ista Pharmaceuticals, Inc. ("Ista"), which had manufactured and sold prescription eye drops Xibrom and Bromday (anti-inflammatory), Bepreve (for allergic conjunctivitis) and Istalol (glaucoma), and began manufacturing and selling those products.  Prior to that time, B+L had manufactured those products under contract with Ista.

53.     On February 25, 2009, Aton acquired the U.S. marketing rights to Timoptic and Timoptic-XE, two glaucoma drugs sold in multi-use eye drop dispensers.  Aton has sold those drugs in the United States since that time.

## The Merck Defendants

54.     The Merck Defendants are corporations incorporated under the laws of New Jersey and have their principal places of business at One Merck Drive, Whitehouse Station, N.J. 08889.

55.     One of the Merck Defendants, Merck, Sharpe & Dohme Corp., is a wholly-owned subsidiary of the other, Defendant Merck & Co, Inc.  Merck, Sharpe & Dohme, Inc. was formerly known as Merck & Co., Inc.  On or about November 4, 2009, Merck & Co., Inc. merged with Schering-Plough Corporation.  As a result of the merger, Schering-Plough Corporation acquired all of the shares of Merck & Co., Inc., and renamed itself Merck & Co., Inc.

56.     Among other products, Merck's prescription eye drop products in multi-dose containers include the glaucoma drugs Cosopt and Trusopt and the anti-bacterial Azasite. Beginning in or about October 2008, Merck manufactured generic versions of Cosopt and Trusopt for Prasco.  In addition, until it sold its Timoptic brand in February 2009, Merck manufactured and sold the glaucoma drugs Timoptic and Timoptic-XE.

13

**Prasco**

57.     Prasco, LLC ("Prasco"), is a limited liability company formed under the laws of the State of Ohio, with its principal place of business at 6125 Commerce Court, Mason, OH 45040.

58.     Prasco distributes "Authorized Generic" pharmaceutical products that are 100% identical to their brand-name equivalents because they are manufactured by the brand-name company and simply made available as a generic under private label.  They are the brand-name drug, just packaged under the Prasco private label name.

59.     Among the Authorized Generic pharmaceutical products that Prasco distributes are two products manufactured for it by Merck:  Dorzolamide Hydrochloride/Timolol Maleate Ophthalmic Solution, which is identical to Merck's Cosopt; and Dorzolamide Hydrochloride Ophthalmic Solution, which is identical to Merck's Trusopt.  Prasco distributes these products in the same Merck dispensing container, known as Ocumeter Plus, as the one in which Cosopt and Trusopt are sold.

**Akorn**

60.     Akorn is a corporation incorporated under the laws of Louisiana and has its principal place of business at 1925 W. Field Court, Suite 300, Lake Forest, Illinois 60045.

61.     Akorn manufactures a full line of therapeutic ophthalmic pharmaceuticals, along with other pharmaceuticals.  Its therapeutic ophthalmic products include antibiotics, steroids, steroid combinations, glaucoma medications, decongestants/antihistamines and anti-edema medications.  Among its ophthalmic products sold in eye drop form are Timolol Maleate, Apraclonidine, Betaxolol, Brimonidine, and Latanoprost.

**JURISDICTION AND VENUE**

62.     This is a class action filed under Rule 23 of the Federal Rules of Civil Procedure.

63.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), which under the provisions of the Class Action Fairness Act explicitly provides for the original jurisdiction in the federal courts of any class action in which any member of the Plaintiff class is a citizen of a State different from any Defendant, and in which the matter in controversy exceeds the aggregate sum of $5,000,000, exclusive of interest and costs, unless the number of members of all proposed Plaintiff classes in the aggregate is less than 100.

64.     Plaintiffs are citizens of Florida, California, Illinois, New Jersey, North Carolina and Texas.  Defendants are citizens of various states, as set forth above.  Therefore, diversity of citizenship exists pursuant to 28 U.S.C. § 1332(d)(2)(A).

65.     The total claims of the individual Class Members are in excess of $5,000,000 in the aggregate, exclusive of interest and costs.

66.     The number of members of the Plaintiff Classes is at least 100.

67.     Venue is proper in this district pursuant to 28 U.S.C. § 1391.

**FACTUAL ALLEGATIONS REGARDING DEFENDANTS' LIABILITY**

68.     Plaintiffs' claims are simple:  For many years, each Defendant has separately engaged in an unfair, unscrupulous, and unconscionable scheme, in violation of FDUTPA and the consumer protection statutes of other states, to increase its profits by selling prescription eye drops in a form that compels consumers to buy and spend money for expensive medication that inherently goes to waste.  Specifically, Defendants sell these drugs in dispensers that emit drops that are so large that they exceed the capacity of the eye, with large portions being expelled from the eye and providing no benefit and a risk of harm.  As a result, Plaintiffs and other Class

15

Members have been compelled to pay for more of Defendants' medication than they should have.

69.     The scientific principles that underlie this claim have been recognized in peer-reviewed medical and pharmaceutical literature over the past four decades, including literature published by, and financially supported by, some of these very Defendants.  This Complaint describes that literature.

## The Amount of Medication That the Eye Can Absorb Is Limited by the Eye's Capacity

70.     The literature establishes, among other scientific principles, that the volume of the inferior fornix, located in the conjunctival cul-de-sac, is only 7-10 microliters ("μL") under normal conditions. When a large eye drop is added to that volume, it leads to overflow because "[t]he conjunctival sac can only hold momentarily about 20-30 μL of fluid without overflow onto the cheek."[10]  None of that overflow enters the inner eye, which is the site of action of the drug.

71.     These principles have been known for decades.  Physicians with the University of Missouri-Kansas City wrote in the American Journal of Ophthalmology during the 1980s:

> Under normal conditions, the human tear volume is approximately 7 μl. This is divided into the upper and lower marginal tear menisci (3 μL per meniscus for a total of 6 μL) and 1 μL in the precorneal tear film.  The eye can hold about 30 μl without overflow if great care is exercised and the subject is not allowed to blink. In the clinical situation, eyedrop administration is followed by reflex blinking, with most of the eyedrop lost to drainage in the first 15 to 30 seconds.  Thus, the greatest portion of an administered eye drop is not used for the desired pharmacologic effect.[11]

---

[10] Luc Van Santvliet and Annick Ludwig, *The Influence of Penetration Enhancers on the Volume Instilled of Eye Drops*, 45 Eur. J. Pharmaceutics and Biopharmaceutics 189, 190 (1998).

[11] Charles M. Lederer & Ralph E. Harold, *Drop Size of Commercial Eye Glaucoma Medications*, 101 Am. J. Ophthalmology 691, 694 (1986) (footnote omitted).

72.     In a major review paper nearly a decade ago, two scientists from the University of

Antwerp Laboratory of Pharmaceutical Testing and Biopharmacy concurred with the above

principles:

> Normally, the human tear volume in the palpebral fissure averages 7 µl in the
> upright position, with 1 µl in the precorneal tear film and about 3 µl in each
> marginal tear meniscus. The maximum volume that the palpebral fissure can
> contain without overflowing is estimated at 30 µl under normal conditions when
> the patient is upright and not blinking. Sudden increases of volume, such as those
> created by the instillation of eye drops, are diminished rapidly by reflex blinking
> and tearing and increased rates of drainage. Restoration of the normal tear volume
> requires about two to three minutes with most of the excess volume lost to
> overflow and drainage in the first 15-30 seconds.  The larger the volume instilled,
> the more rapidly it is drained through the naso-lacrimal duct system. [12]

73.     More recently, scientists from Emory University Eye Center wrote in the Journal

of Glaucoma:

> Under normal conditions, the tear volume in the conjunctival cul-de-sac is 7 to 9
> µL in humans with a turnover rate of 0.5 to 2.2 µL/min, and the maximum volume
> that the conjunctival cul-de-sac can contain is estimated to be 30 µL.  Commercial
> eyedroppers typically deliver between 25.1 and 56.4 µL; with an average drop
> volume of 39 µL. This sudden increase in volume in the conjunctival cul-de-sac
> and the irritant properties of the drug cause rapid reflex blinking and increased
> tear secretion. Most of the drug leaves the conjunctival cul-de-sac through the
> lacrimal drainage system and the excess is spilled onto the cheeks. [13]

The lacrimal or nasolacrimal drainage system is the route by which tears are drained from the

eye through the tear duct into the nasal cavity and from there into the bloodstream.

74.     A pharmacy and pharmaceutical textbook entitled *Drug Delivery and Targeting*

*for Pharmacists and Pharmaceutical Scientists* ("Drug Delivery textbook") summed up these

principles as follows:

---

[12] Luc Van Santvliet & Annick Ludwig, *Determinants of Eye Drop Size*, 49 Surv. Ophthalmology 197-213 at 197 (2004) (footnotes omitted).

[13] Deepta Ghate & Henry F. Edelhauser, *Barriers to Glaucoma Drug Delivery*, 17 J. Glaucoma 147, 147 (2008) (footnote omitted).

Under normal conditions the human tear volume is about 7-9 µl and it is relatively constant. The maximum amount of fluid that can be held in the lower eyelid sack is 25-30 µ1, but only 3µl of a solution can be incorporated in the precorneal film without causing it to destabilize. When eye-drops are administered, the tear volume is suddenly increased which can cause rapid reflex blinking. Most of the eyedrop is pumped through the lacrimal drainage system into the nasolacrimal duct, and some is spilled on the cheeks and splashed on the eyelashes.[14]

### Equivalence of Effectiveness of Larger and Smaller Eye Drops

75.     Consistent with these principles, scientific studies have shown that larger eye drops are no more effective than drops of 15 µL or smaller.  In fact, larger eye drops may be even less effective than smaller drops.

76.     In 1977, a scientist from the University of Kansas reported in the *Journal of Pharmaceutical Sciences* that a five-fold reduction in the volume of eye drops instilled in rabbits resulted in the same drug concentration at the active site in the eye as the larger drop.  The study concluded:   "Therapeutically, it should be possible, by reducing the instilled volume by a factor of five, to reduce the dose administered by approximately a factor of three without altering drug concentration at the active site.  This finding is significant and shows that the doses currently used for ophthalmic drugs are generally much larger than required."[15]

77.     A 1984 study in *Archives of Ophthalmology* by scientists from the University of Arkansas similarly found that a 15 µL "minidrop" of the glaucoma drug clonidine was just as effective in reducing pressure inside the eye as a 70 µL drop.[16]

---

[14] Drug Delivery and Targeting for Pharmacists and Pharmaceutical Scientists (A.M. Hillery, A.W. Lloyd and J. Swarbrick, eds.) at 335 (2001).

[15] Thomas F. Patton, Pharmacokinetic Evidence for Improved Ophthalmic Drug Delivery by Reduction of Instilled Volume, 66 J. Pharmaceutical Sci. 1058, 1059 (1977).

[16] Gissur Petursson *et al., Treatment of Glaucoma Using Minidrops of Clonidine*, 102 Archives of Ophthalmology 1180 (1984).

78.    Three years later, scientists from the University of Texas Health Science Center and the University of Iowa College of Pharmacy reported in *Archives of Ophthalmology* that an 8 µL dilating eye drop had the same effect on the eyes of infants as a regular 30 µL drop.[17]

79.    Alcon itself has shown that smaller eye drops are as effective as larger drops.  In a study published in the *American Journal of Ophthalmology*, three scientists from Alcon, along with scientists from the Johns Hopkins School of Medicine, compared a 16 µL drop of a 0.5% concentration of the glaucoma drug apraclonidine hydrochloride to both a 30 µL drop of that concentration and a 30 µL drop of even a higher concentration, 1.0%.  They found that the 16 µL drop achieved "a similar duration and magnitude of intraocular pressure reduction" to the larger drops.  They concluded that "a 16-µL drop size was both effective and well-tolerated."[18] Nevertheless, Alcon refused to sell its products with such small drops because, as the company's top marketing executives told the study's senior author, Dr. Alan Robin of Johns Hopkins School of Medicine, it would mean that patients would be able to use the bottles longer and Alcon would therefore sell less product and make less money.

80.    Allergan has also proven that smaller eye drops are as effective as the larger drops on the market.  In 1989, three scientists from Allergan, along with scientists from Yale University School of Medicine and other leading institutions, published "a randomized, double-masked, parallel, chronic study" comparing the effectiveness and safety of three different drop sizes, 20 µL, 35 µL and 50 µL, of the glaucoma drug levobunolol 0.5% (Allergan's branded

---

[17] Mary G. Lynch et al., Reduction of Phenylephrine Drop Size in Infants Achieves Equal Dilation With Decreased Systemic Absorption, 105 Archives of Ophthalmology 1364 (1987).

[18] Vocci (1992) at 160.

"Betagan").[19]  The authors found no difference in either safety or effectiveness.  They stated:  "In summary, we found that varying the drop size within the range of 20 to 50p.L has no clinically significant effect on either efficacy or safety of a beta blocker such as levobunolol." [20]

81.     Based on the above studies and others, the peer-review literature uniformly indicates that smaller eye drops are at least as bioavailable in the eye as larger drops and may even be more bioavailable.  Bioavailability is the extent and rate at which a drug accesses the desired site of action.  A drug must be bioavailable to be effective.

82.     In a thorough review of the world literature related to eye drop size that cited 117 references, Van Santvliet and Ludwig of the University of Antwerp stated that, in contrast with commercially available drops of 26-69 µL, "[f]rom bioavailability and toxicological points of view, even smaller eye drops, of 5 to 15 µL, should be instilled."[21]  In this paper, published in *Survey of Ophthalmology*, they concluded:  "The advantages of reduced drop sizes include equivalent or even improved ocular bioavailability and therapeutic response to the drug."[22]

83.     Similarly, according to the *Drug Delivery* textbook quoted above, smaller drops drain away from the eye at a slower rate than larger drops and are therefore preferable:  "The drainage rate of the solution is related to the instilled volume; the smaller the volume the slower the drainage rate. The instilled drop has been suggested to have an optimum volume of 8-15 µl. However, the typical volumes delivered by commercial eyedroppers are in the range of 35-56 µl."[23]

---

[19] Arthur D. Charap et al., Effect of Varying Drop Size on the Efficacy and Safety of a Topical Beta Blocker, 21 Ann. Ophthalmol. 351 (1989).

[20] Charap at 356.

[21] Van Santvliet and Ludwig (2004) at 197.

[22] Van Santvliet and Ludwig (2004) at 198.

[23] Drug Delivery and Targeting for Pharmacists and Pharmaceutical Scientists at 335.

## Larger Eye Drops Present a Greater Risk of Systemic Side Effects Compared to Smaller Drops

84.     Most of the excess drug contained in Defendants' prescription eye drops leaves the eye through the lacrimal or tear duct and enters the body's systemic circulation without first undergoing metabolic inactivation in the liver.  One researcher states:  "Sixty to 80 per cent of the dose of an eyedrop will be absorbed systemically though the nasolacrimal duct and nasal mucosa without first-pass metabolism."[24]

85.     The 1989 Allergan study[25] described this process and related it to the therapeutic index of ophthalmic drugs.  The therapeutic index is the balance between the desired result (*i.e.*, treatment of disease) and the risk of harm (*i.e.*, side effects).   As one author stated, "[a] major goal of any therapy is to improve the therapeutic index, *i.e.,* enhance the desired result while minimizing the risk."[26]  The Allergan study stated:

> Since the normal human adult lacrimal lake is approximately 7 µL, commercial eyedrops can increase the volume of fluid in the eye initially by more than seven times.  The excess fluid can roll down the cheek and be a nuisance to the patient.  Of greater medical importance is the absorption of the excess drug through nasolacrimal drainage.
>
> The pharmacologic effect of absorption is similar to an intravenous injection. The drug enters the bloodstream as a bolus and bypasses the initial hepatic inactivation that occurs with oral medication.  Systemic absorption of ocular medications is of particular concern for drugs such as beta blockers that have potent systemic effects.
>
> Results of studies in both rabbits and humans support the hypothesis that administering a given quantity of ophthalmic medication in a reduced drop volume may enhance ocular bioavailability, decrease systemic absorption and improve the therapeutic index.  Other studies suggest that reducing the drop size

[24] A. Cox, *Systemic Effects of Ocular Drugs*, 2002 Adverse Drug Reaction Bulletin 823, 823.

[25] Charap.

[26] Mary G. Lynch, *Reducing the Size and Toxicity of Eye Drops*, Research to Prevent Blindness Science Writers Seminar 20 (1988).

of existing medications with no compensatory increase in concentration may reduce systemic absorption without sacrificing ocular efficacy. [27]

86.     Those authors also offered an explanation for why the smallest drops that they studied, which were 20 µL, were not safer than the larger drops they studied, 35 and 50 µL. They suggested that improved safety does not occur unless the drops are smaller than 20 µL. They stated: "[C]linical changes may not be detectable unless the drop-size volume is decreased below a critical volume."[28]

87.     An article by scientists from the Department of Ophthalmology of Truman Medical Center and the University of Missouri-Kansas City concurred that smaller drops would improve the therapeutic index:  "Alteration of eyedrop delivery systems and alteration of the medication's physical properties to produce smaller drops could greatly diminish the cost of topical glaucoma therapy and improve the therapeutic index."[29]

88.     The principle that smaller eye drops have a lower potential for toxic side effects than larger drops has actually been known since the 1970's.  In 1977 a scientist from the Department of Pharmaceutical Chemistry, School of Pharmacy, University of Kansas stated in the Journal of Pharmaceutical Sciences:  "By reducing the instilled volume and, hence, substantially decreasing the applied dose, the potential for toxic effects is reduced while drug concentration in the eye is maintained."[30]

89.     According to the *Drug Delivery* textbook quoted above, "nasolacrimal drainage is the major factor contributing to precorneal drug loss and systemic side-effects.  The

---

[27] Charap at 351-52.

[28] Charap at 355.

[29] Lederer (1986) at 694.

[30] Patton (1977) at 1059.

local/systemic effect balance can be improved by reducing the size of the eyedrop, and tips capable of delivering a drop of 8-10 μl have been designed by varying the relationship between the inner and outer diameters of the end of the tip."[31]

90.     Consistent with that principle, the Alcon study that compared 16 and 30 μL drops, found that the smaller drops were "[t]he best tolerated."[32]

91.     According to another study, systemic effects from ocular medication may go undiagnosed but are still experienced by the patient.  In the case of β-andrenoceptor antagonists such as timolol maleate (Merck's branded Timoptic products), levobunolol hydrochloride (Allergan's Betagan) and other drugs used for glaucoma, systemic effects can include respiratory effects such as bronchospasm; cardiovascular effects such as palpitation, reduced blood pressure and slowed heart rate; and central nervous system effects such as depression, anxiety, disorientation and confusion.  The elderly are at increased risk of these effects.  A class of eye drops called $α_2$-adrenoreceptor agonists, such as brimonidine (Allergan's Alphagan and Alphagan-P), can cause systemic effects such as systemic hypotension, headaches, fatigue, somnolence and dry mouth.[33]

92.     A table in a pharmacology textbook[34] lists the following systemic effects caused by two classes of glaucoma medications:

---

[31] Drug Delivery and Targeting for Pharmacists and Pharmaceutical Scientists at 339.

[32] Vocci (1992) at 154.

[33] Cox (2002).

[34] *Clinical Ocular Pharmacology* at 9 (Jimmy D. Bartlett & Siret D. Jaanus, eds., 5th ed. 2008).

| | Clinically Significant Systemic Effects Caused by Ocular Medications | |
|---|---|---|
| **Ocular Drug** | Clinical Circumstance Under Which Adverse Effect Occurs | **Systemic Effect** |
| β-Blockers | Treatment of open-angle glaucoma | Decreased cardiac rate, syncope, exercise intolerance, bronchospasm, emotional or psychiatric disorders |
| Brimonidine | Treatment of open-angle glaucoma | Dry mouth, central nervous system effects including fatigue, lethargy |

β-Blockers include Alcon's Betoptic-S, Allergan's Betagan, Merck's Timoptic, Timoptic-XE and Cosopt (a combination of timolol and dorzolamide), B+L's Istalol, and generic timolol maleate and levobunolol.  Brimonidine is the generic name for Allergan's Alphagan P. Allergan's Combigan is a combination of the β-Blocker timolol and brimonidine.  Merck's Cosopt and Prasco's Dorzolamide/Timolol are also combination products containing timolol.

93.     Prostaglandins and prostaglandin analogues, which include Alcon's Travatan and Travatan Z, Allergan's Lumigan, and Pfizer's Xalatan, have systemic side effects including "occasional headache, precipitation of migraine in susceptible individuals, skin rash and mild upper respiratory tract symptoms."[35]  In addition, their excessive size causes a risk of local side effects such as lengthening, thickening and hyperpigmentation of eyelashes, darkening of the iris, and hyperpigmentation of the skin around the eye.[36]

**The Scientific Literature States That Drops Should Be No Larger Than 15 µL**

94.     According to the scientific literature, from the standpoint of bioavailability and reducing risk of side effects, eye drops no larger than 5-15 µL should be used.  Any amount in excess of that range is totally wasted.

_____

[35] J.J. Kanski, Clinical Ophthalmology: A Systematic Approach (2007)

[36] Id.

95.     This principle has been known for many decades by Allergan as well as the scientific world.  In 1973, Allergan financially supported a paper published by scientists from the School of Pharmacy, University of Wisconsin-Madison, in the *Journal of Pharmaceutical Sciences*. According to these authors, "to maximize activity of drugs in humans, the drop size of ophthalmic delivery systems ought to be reduced from its present 50-75-µl. drop to at most a 5- or 10-µL drop."[37]

96.     More recently, citing six references spanning more than two decades, the scientists from the University of Antwerp quoted above stated:  "It has been suggested that a decrease in drop size, to between 5 µl and 15 µl, would reduce the amount of overflow, the rate of drug loss through drainage, the incidence of systemic side effects, and the cost of therapy."[38]

97.     In another paper, those same scientists stated:  "The drop size of commercially available ophthalmic solutions ranges from 25 to 70 µL with an average of about 40 µL.  From a biopharmaceutical and toxicological point of view, however, it is important to instill small volume eye-drops, with an ideal volume of 5-15 µL."[39]

98.     Scientists from McGill University in Montreal and Fluminense Federal University in Rio de Janeiro, writing in *the Journal of Clinical Pharmacy and Therapeutics*, likewise advocated smaller drops.  "Concerning bioavailability and toxicity," they stated, "drops of 5-15 µL would be ideal."[40]

---

[37] Sukhbir S. Chrai *et al., Lacrimal and Instilled Fluid Dynamics in Rabbit Eyes*, 62 J. Pharmaceutical Sci., 1112 at 1112 (1973).

[38] Van Santvliet & Ludwig (2004) at 198.

[39] Luc Van Santvliet and Annick Ludwig, *Influence of the Dropper Tip Design on the Size of Eye-drops* (2001) (footnotes omitted).

[40] M.P. Ventura et al., Cost Considerations of the New Fixed Combinations for Glaucoma Medical Therapy, 30 J. of Clinical Pharmacy and Therapeutics 251, 253 (2005).

99.     In a study published in the *Journal of Glaucoma* in 2008, the scientists from Emory University quoted above also recommended the use of smaller drops, stating:  "Reducing the drop size to 5-15 μL would reduce overflow, decrease systemic absorption, reduce cost of therapy while maintaining equivalent or even enhanced ocular bioavailability."[41]

100.     On information and belief, at all times relevant hereto, Defendants were well-aware of these principles and knew or should have known that the dispensing of prescription eye drops exceeding 15 μL would result in unnecessary wastage of medicine, an increased risk of systemic side effects, and an unnecessary and wasted therapeutic expense to patients and/or their third party payors.

101.     Indeed, Allergan has stated as much to the scientific community on several occasions.  In a 2011 medical e-book on glaucoma, an Allergan scientist wrote:  "Smaller size drops, on the order of 15 μL, have an efficacy and bioavailability equivalent to larger drops, without the waste. In fact, drops of this size are preferable, as they minimize systemic exposure and wastage."[42]

102.     Five years earlier, two Allergan employees co-authored, and Allergan funded, a paper in the Journal of Ocular Pharmacology and Therapeutics that stated:  "Studies have shown that the bioavailability and efficacy of drops as small as 15 μL are equivalent to those of larger drops.  Therefore, smaller drops would be preferable to minimize systemic exposure and spilled or wasted medication."[43]

103.     Even earlier, in 1989, three Allergan scientists, along with co-authors from institutions such as Yale University School of Medicine, published the study described above in

---

[41] Ghate & Edelhauser (2008) at 147.

[42] J. Walt (2011) at 208.

[43] Fiscella *et al.* (2006) at 478.

which they found that drops of 20 μL were just as effective as drops of 50 μL; in that paper they favorably cited three studies that "suggest that reducing the drop size of existing medications with no compensatory increase in concentration may reduce systemic absorption without sacrificing ocular efficacy."[44]  Nevertheless, neither Allergan nor any of the other Defendants reduced the drop size of their existing medications.

## Defendants' Eye Drops Are Much Larger Than 15 μL

104.    As part of a scheme to increase profits by selling more product than consumers want or need, each Defendant sells ophthalmic medication in bottles that instill drops that are two and three times 15 μL or more.

105.    Research has demonstrated that "commercial eyedroppers typically deliver between 25.1 and 56.4 μL; with an average drop volume of 39 μL."[45]

106.     As the University of Antwerp paper quoted above states, citing eight separate studies, "[o]phthalmologists and hospital pharmacists performing studies to determine the cost per dose and per bottle of eye medication reported eye drop volumes ranging from 26.4 μL up to 69.4 μL."[46]

107.    Studies published in respected peer-reviewed medical and pharmaceutical journals such as the *American Journal of Ophthalmology* and the *Journal of Clinical Pharmacology and Therapeutics* published in 1999, 2003, 2005, and 2008 have shown that Defendants' prescription eye drops greatly exceeded the optimum size.[47]  The 1999 paper was

---

[44] Charap (1989) at 352.

[45] Ghate & Edelhauser at 147.

[46] Van Santvliet & Ludwig (2004) at 197.

[47] Nathan R  Rylander & Steven D. Vold, *Cost Analysis of Glaucoma Medications*, 145 Am. J. Ophthalmology 106-113 (2008); Ventura *et al.* (2005); Richard G. Fiscella *et al.*, *Medical Therapy Cost Considerations for Glaucoma*, 136 Am. J. Ophthalmology 18-25 (2003); Richard G. Fiscella *et al.*, *Cost Considerations of Medical Therapy for*

financially supported by Merck.  These studies provided data from which one can calculate the drop sizes; they show that Defendants' drops uniformly exceeded 15 μL by large amounts (numbers represent the drop sizes in μL):

108.   **Alcon.**

**Betoptic-S:**

| Bottle Size | 1999 | 2003 | 2008 |
|---|---|---|---|
| 2.5 mL | NA | NA | 43 |
| 5 mL | 34 | 34 | 40 |
| 10 mL | 39 | 39 | 38 |
| 15 mL | 33 | 33 | 37 |

**Timolol Maleate (Falcon):**

| Bottle Size | 1999 | 2003 | 2008 |
|---|---|---|---|
| 5 mL | 35 | 35 | 32 |
| 10 mL | 32 | 32 | 34 |
| 15 mL | 34 | 34 | 32 |

**Timolol Maleate gel forming (Falcon):**

| Bottle Size | 1999 | 2003 | 2008 |
|---|---|---|---|
| 5 mL | 35 | 35 | 32 |
| 10 mL | 32 | 32 | 34 |
| 15 mL | 34 | 34 | 32 |

**Azopt:**

| Bottle Size | 1999 | 2003 | 2008 |
|---|---|---|---|
| 5 mL | 41 | 41 | 34 |
| 10 mL | 39 | 39 | 34 |
| 15 mL | 40 | 40 | 31 |

---

*Glaucoma*, 128 Am. J. Ophthalmology 426-433 (1999).  Some studies report the number of drops per milliliter; drop size is determined by dividing one milliliter by the number of drops per milliliter.

**Travatan:**

| Bottle Size | 2003 | 2008 |
|---|---|---|
| 2.5 mL | 29 | 26 |
| 5 mL | NA | 25 |

**Travatan Z:**

| Bottle Size | 2008 |
|---|---|
| 2.5 mL | 29 |
| 5 mL | 30 |

109.   **Allergan.**

**Betagan:**

| Bottle Size | 1999 | 2003 |
|---|---|---|
| 5 mL | 45 | 45 |
| 10 mL | 48 | 48 |
| 15 mL | 49 | 49 |

**Alphagan/Alphagan P:**

| Bottle Size | 1999 | 2003 | 2008 |
|---|---|---|---|
| 5 mL | 47 | 47 | 43 |
| 10 mL | 42 | 42 | 44 |
| 15 mL | 46 | 46 | 43 |

**Lumigan:**

| Bottle Size | 2003 | 2008 |
|---|---|---|
| 2.5 mL | 27 | 31 |
| 5 mL | 29 | 31 |
| 7.5 mL | 29 | 31 |

**Combigan:**

| Bottle Size | 2005 |
|---|---|
| 5 mL | 33 |

29

110.  **Pfizer.**

      **Xalatan**

| Bottle Size | 1999 | 2003 | 2008 |
|---|---|---|---|
| 2.5 mL | 31 | 36 | 34 |

111.  **B+L.**

      **Levobunolol:**

| Bottle Size | 1999 | 2003 |
|---|---|---|
| 5 mL | 52 | 52 |
| 10 mL | 50 | 50 |
| 15 mL | 51 | 51 |

      **Optipranolol:**

| Bottle Size | 1999 | 2003 | 2008 |
|---|---|---|---|
| 5 mL | 38 | 38 | 38 |
| 10 mL | 40 | 40 | 40 |

      **Timolol Maleate:**

| Bottle Size | 1999 | 2003 | 2008 |
|---|---|---|---|
| 5 mL | 31 | 31 | NA |
| 10 mL | 29 | 29 | NA |
| 15 mL | 31 | 31 | NA |

112.  **Merck.**

      **Timoptic:**

| Bottle Size | 1999 | 2003 | 2008 |
|---|---|---|---|
| 2.5 mL | 31 | NA | NA |
| 5 mL | 34 | 30 | 36 |
| 10 mL | 31 | 32 | 34 |
| 15 mL | 32 | 32 | NA |

30

**Timoptic XE:**

| Bottle Size | 1999 | 2003 | 2008 |
|---|---|---|---|
| 2.5 mL | 42 | 42 | NA |
| 5 mL | 38 | 38 | 46 |

**Trusopt:**

| Bottle Size | 1999 | 2003 | 2008 |
|---|---|---|---|
| 5 mL | 39 | 38 | NA |
| 10 mL | 39 | 36 | 43 |

**Cosopt:**

| Bottle Size | 1999 | 2003 | 2005 | 2008 |
|---|---|---|---|---|
| 5 mL | 37 | 34 | 40 | NA |
| 10 mL | 39 | 35 | NA | 45 |

113.   **Akorn**

| Bottle Size | 1999 | 2003 |
|---|---|---|
| 5 mL | 33 | 33 |
| 10 mL | 32 | 32 |
| 15 mL | 31 | 31 |

114.    Documents of the United States Food & Drug Administration, available at the

FDA's "Drugs@FDA" web site, also show that Defendants' prescription eye drops are well over

15 μL.  FDA Pharmacological, Medical and other Reviews of these drugs show the following

drop sizes (numbers are in μL):

**Alcon**

Brimonidine tartrate 0.015%:  41.8

Travatan:  25

Travatan Z:  25

31

Vigamox:  38

**<u>Allergan</u>**

Alphagan: 35

Acular LS:  50

Combigan:  35

Elestat:  30-35

Lastacaft:  35

Lumigan 0.3%:  30

**<u>B+L/Ista</u>**

Alrex:  50

Besivance:  37

Xibrom/Bromday:  50

Istalol:  50

Lotemax:  50

Zylet:  50

**<u>Merck</u>**

Azasite:  50

115.    Other FDA reviews do not directly specify drop size, but they provide data from which the following drop sizes can be calculated (numbers are in μL):

**<u>Alcon</u>**

Azopt:  50

Moxeza:  50

Nevanac:  50

**Allergan**

Alocril: 40

Zymaxid: 40

**B+L/Ista**

Bepreve:  50

**Large Eye Drops Cause Substantial Injuries to Consumers**

116.    Defendants' practices of selling prescription eye drops in dispensers that emit drops larger than 15 µL cause substantial injury, both because they compel Class Members to spend more money on their therapy than if the drops were 15 µL and because larger eye drops cause unwarranted health and safety risks.

117.    If the sizes of Defendants' prescription eye drops were limited to the maximum effective size of 15 µL, or even 16 µL, as in the Vocci study, the medication in the bottles would last longer and Class Members would spend substantially less on their therapy than they do with larger, substantially wasted, eye drops.  This principle is not only obvious on its face, but it has been stated repeatedly in the medical and pharmaceutical literature.

118.    In a 1986 study published in the *American Journal of Ophthalmology* that reported that drop sizes of several commercial glaucoma medications averaged 39 µL, the authors stated:  "In addition to the pharmacologic advantages of a smaller drop, there are significant economic implications."   The authors described those economic implications as follows:  "If the eyedrops could be reduced to 15 µL (shown to be effective with clonidine eyedrops), the average bottle would yield 1,033 drops, sufficient for 36.9 weeks of therapy."  By contrast, the authors found that an average bottle of a glaucoma drug with drops of 39.8 µL, yielded 389 drops, good for only 13.9 weeks of therapy.  The authors concluded:  "Alteration of eyedrop delivery systems and alteration of the medication's physical properties to produce

33

smaller drops could greatly diminish the cost of topical glaucoma therapy and improve the therapeutic index."[48]

119.    Similarly, the Emory University study quoted above stated:  "Reducing the drop size to 5-15 µL would reduce overflow, decrease systemic absorption, reduce cost of therapy while maintaining equivalent or even enhanced ocular bioavailability."[49]

120.    Allergan agrees that smaller drops would result in lower costs for patients and managed care providers.  The 2006 study by Allergan states:  "Obviously, a smaller drop size would mean that more doses could be dispensed from each bottle of medication, providing cost savings to patients and managed care providers."[50]

121.    Merck has publicly indicated that the design of the dropper tips, which determines drop size, is an important influence in the cost of eye drop therapy.  In a 1996 paper, its scientists stated:  "Many factors influence the daily cost of therapy for eyedrops.  In a study of drop size, Brown *et al.* concluded the design of eyedropper tips is important because it determines the size and flow rate of the bottle."[51]

122.    The amount of overpayment that consumers and other payors have been compelled to make because of overly large prescription eye drops is substantial.  For example, according to Rylander (2008), the average drop size for Allergan's glaucoma drug Alphagan P 0.15% in a 5 mL bottle was 43 µL, and the bottle held 5.17 mL of medication.  At the recommended dose of one drop in each affected eye three times daily, a 5 mL bottle would last a

---

[48] Lederer at 694 (1986).

[49] Ghate & Edelhauser (2008) at 147.

[50] Fiscella *et al.* (2006) at 478.

[51] David Hartenbaum et al., Quantitative and Cost Evaluation of Three Antiglaucoma Beta-Blocker Agents:  Timoptic-XE versus Two Generic Levobunolol Products, II Am. J. of Managed Care 157, 162 (1996).

patient with bilateral glaucoma 20 days.  That patient would go through 18.25 bottles in a year.
In July 2013, a 5 mL bottle of Alphagan P at www.drugsdepot.com cost $104.99.[52]  A year's
course of treatment would therefore cost approximately $1,915.  However, approximately 65%
of the medication, the amount over 15 µL, would be wasted.  If the drops had been only 15 µL,
the patient would have needed only 6.46 bottles a year, or 7.0 bottles if the drops had been 16
µL, as in the Vocci study.  The unneeded medication would cost the patient $1,000 a year.

123.    A similar analysis shows that the use of Alcon's Betoptic S, B+L's Istalol,
Pfizer's Xalatan and Merck's Cosopt can cost a consumer $596, $1103, $546, and $644 a year
respectively in wasted medication.

124.    In the aggregate, the amount of money spent on inherently wasted medication is
substantial.  For example, the web site www.drugs.com estimates that in 2010 alone, retail sales
of Pfizer's Xalatan in the United States exceeded $500 million.[53]  But only 44% of each 34 µL
drop was useful in treating the patients' glaucoma.  The 56% of the medication that went to
waste cost $280 million in that one year alone.

125.    The overall amounts that consumers and third-party payors have been compelled
to spend on medication that provided no benefit because of the unfair, unethical and
unconscionable practices of these Defendants can be multiplied many times over when all of the
Defendants' prescription eye drops are considered.

126.    Furthermore, as described above, the large drop sizes of Defendants' prescription
eye drops cause much of the medication to pass through the tear duct and, without first being

---

[52]   http://www.drugsdepot.com/catalog.php/drugsdepot/dt/pd2012060/Alphagan_P_.15_Drops_1X5_ml_Mfg._By_-Allergan_Inc (accessed December 5, 2013).

[53] http://www.drugs.com/top200.html (accessed December 5, 2013).

metabolically inactivated, enter the patient's circulation where it causes a risk of systemic side effects.

127.    In addition, the large drop sizes of these products contributes to a situation where many glaucoma patients run out of medication before their insurance or managed care plan will reimburse them for a new bottle of medication.  They thus have to choose between paying the full price of the drug themselves or going without.  However, because of the high prices of these medications, many consumers cannot afford to pay for them without third-party reimbursement. Therefore, they either go without their needed medications or attempt to "ration" them by, for example, using them every other day rather than the prescribed daily use.

128.    As a result, because they cannot afford to use their medication every day as prescribed, these consumers run the risk of a decline in their eyesight or going completely blind.

### Consumers Could Not Reasonably Have Avoided This Injury

129.    Consumers could not reasonably have avoided the injuries they sustained as a result of using prescription eye drops that are larger than the capacity of their eyes.  There are several reasons for this.

130.    First, individual patients do not choose which drugs to take; they are prescribed their drugs by their physicians.  Once the doctor has prescribed a prescription eye drop, the patient has no alternative other than rejecting the physician's advice and foregoing the treatment entirely.

131.    Moreover, wastage cannot be avoided by switching to an alternative product, because all prescription eye drops are substantially larger than 15 μL and therefore lead to wastage.

36

132.    Besides that, it is impossible to instill less than one eye drop into an eye.  Thus, a consumer must consume the entirety of the excessively large drop supplied by the manufacturer, even though only a portion provides any benefit.

### There Are No Countervailing Benefits from Eye Drops that Are Larger than the Capacity of the Eye

133.    Furthermore, the injuries of Plaintiffs and Class Members are not outweighed by any offsetting consumer or competitive benefits.  In fact, there are no consumer or competitive benefits from the excessive sizes of Defendants' eye drops

134.    Thus, there is no valid, legitimate or ethical reason why Defendants have not supplied prescription eye drops in bottles that dispense drops no larger than 15 μL or 16 uL as in the Vocci study.  The only reason Defendants make their eye drops as large as they are is to sell more product.

### The Sizes of Defendants' Eye Drops Are Within Their Control

135.    Defendants are, and have been, able to sell their medications in dispensers emitting smaller drops.  The size of the drops emitted by the dropper depends on the specific dropper tip used, a factor entirely within the control of the manufacturer.  In 1988, Dr. Mary Lynch of Emory University told the Tenth National Science Writers Seminar in Ophthalmology, sponsored by the organization Research to Prevent Blindness:  "The size of an eyedrop is determined by the dimensions of the eyedropper tip: the inner diameter or hole and the outer diameter of the tip."[54]

---

[54] Lynch (1988) at 20

136.    This is a principle that Allergan recognizes.  In his e-book chapter, the Allergan scientist quoted above stated that the size of eye drops "depends on the design and dimensions of the dropper tip …."[55]

137.    Thus, Defendants could substantially reduce drop size simply by changing the design and dimension of the dropper tip.  In 1985, the Wilmer/Johns Hopkins and Bascom Palmer scientists mentioned above reported that "[c]hanges in the dimensions of an eyedropper tip can alter eyedrop volume markedly."  By experimenting with different dimensions, they were able to create dispensers that emitted drops of only 11 μL and 19 μL.  To assist anyone who wanted to manufacture these dispensers to make smaller drops available commercially, they published the dimensions of their newly created tips.[56]

138.    The authors also included the following photograph comparing a standard-sized eye drop to a 19 μL drop that they created:



**Fig. 2** (Brown, Hotchkiss, and Davis). A standard-sized eyedrop (left) from a commercial eyedropper tip compared to a smaller eyedrop produced by one of the smaller tips we used (outer diameter = 0.047 inch; inner diameter = 0.020 inch).

139.    On information and belief, none of the Defendants has ever publicly criticized this study or suggested that it has any limitations.  Indeed, Merck recognizes its validity.  In a paper

---

[55] Walt (2011) at 208.

[56] Brown *et al.* (1985).

that showed the significant effect drop size can have on the costs consumers bear for eye drops, Merck's employees stated: "Many factors influence the daily cost of therapy for eyedrops. In a study of drop size, Brown *et al.* concluded the design of eyedropper tips is important because it determines the size and flow rate of the bottle."[57]

140.     Three years after the Brown study was published, one of its co-authors, Dr. Mary Lynch, told the Tenth National Science Writers Seminar in Ophthalmology that she was by then able to create droppers that would consistently emit drops of only 8 to 10 μL and could thereby enhance the desired result from eye drops. She stated:

> A major goal of any therapy is to improve the therapeutic index, *i.e.,* enhance the desired result while minimizing the risk. One way to improve the therapeutic index of an eyedrop is to reduce the size of the eyedrop. By varying the relationship between the inner and outer diameters of the end of the tip, the size of an eyedrop can be altered. We have designed eyedrop tips that can consistently deliver eyedrops as small as 8 to 10 microliters.[58]

141.     In 1992, scientists from Alcon co-authored a paper, described above, in which a smaller drop size was compared to a standard drop. For the smaller drop, the authors used "a potentially commercially available eyedrop bottle that delivers a 16-μl drop size."[59] The authors reported that the users of that bottle "agreed it was easier to squeeze and deliver one drop with this bottle and therefore preferred the new eyedrop bottle to the conventional eyedrop bottle."[60] Nevertheless, Alcon has never sold eye drops using that bottle because, as described above, it would sell less product if it did.

---

[57] Hartenbaum (1996) at 162.

[58] Lynch (1988) at 21.

[59] Vocci (1992) at 157.

[60] Vocci (1992) at 159.

142.    Recently, a standard textbook in the field, *Clinical Ocular Pharmacology*, reported that "it is practical to dispense accurately measured drops as small as 2 to 5 µL by reducing the bore size of commercial dropper dispensers."[61]

143.    Nevertheless, Defendants have persisted in selling their drops in droppers that emit much larger drops.

## Other Factors that Might Influence the Size of Eye Drops Do Not Prevent Defendants from Reducing the Sizes of their Eye Drops

144.    Although there are other factors, such as the viscosity and surface tension of the liquid and the dispensing angle that can influence the size of eye drops, none of those factors prevents Defendants from reducing drop size by changing their dropper tips.

145.    For any given topical ophthalmic medication, the viscosity and surface tension of the liquid are a constant and do not prevent Defendants from reducing drop size by changing the dimensions of their dropper tips.

146.    Nor does any variability because of the dispensing angle prevent Defendants from reducing drop size.  Studies have found that the dispensing angle has either no effect or a small effect on drop size.

147.    A 1992 study compared the size of drops when the bottle was held vertically and at 135° (*i.e.*, halfway between vertical and horizontal).[62]  The results for Alcon's Betoptic and Betoptic S, B+L's Optipranolol, and Merck's Timoptic "provided a consistently measured dose regardless of the angle at which the bottle was held …."  The drops of the fifth product, Allergan's Betagan, were 14.5% smaller when dispensed obliquely than when dispensed

---

[61] *Clinical Ocular Pharmacology* at 18 (Jimmy D. Bartlett & Siret D. Jaanus, eds., 5th ed. 2008).

[62] S.F. Ball et al., Cost of B-Adrenergic Receptor Blocking Agents for Ocular Hypertension, 110 Arch. Ophthalmol. 654 (1992).

vertically at room temperature but were still more than three times the ideal size (47 μL vs. 55 μL).

148.    A study by Merck found no statistically significant difference in the drops of B+L's Levobunolol when drops were dispensed vertically or at an oblique angle for all three bottle sizes.  Nor was there a significant difference for Merck's own product, Timoptic-XE.[63]

149.    The two scientists from the University of Antwerp quoted above have studied the differences between holding a bottle vertically and at 45°, using at least four different commercially available dispenser tips and 10 separate solutions that they formulated for experimental purposes.[64]  Depending on the dispenser-solution combination, they found either a negligible difference or a variance of between 2% and about 10%.

150.    The 2006 Allergan study[65] compared drop sizes when dispensed vertically and at 45° of bimatoprost (the generic name for Allergan's Lumigan), latanoprost (Pfizer's Xalatan), and travoprost (Alcon's Travatan).  The differences between vertical and 45° were 5.1%, 6.2%, and 19.4% for the three drugs respectively.[66]

151.    At the time of that study, the Allergan authors believed that these differences were so significant that patients should be instructed about the proper angle at which to hold the bottle.

---

[63] Hartenbaum (1996) at 161.

[64] L. Van Santvliet and A. Ludwig studies:  Influence of the physico-chemical properties of ophthalmic viscolysers on the weight of drops dispensed from a flexible dropper bottle, 7 Eur. J. Pharm. Sci. 339 (1999); Dispensing Eye Drops from Flexible Plastic Dropper Bottles.  Part II: Influence of the physico-chemical properties of the formulation and the manipulation technique by the patient, 61 Pharm. Ind. 194 (1999); and Influence of the Dropper Tip Design on the Size of Eye-Drops, 63 Pharm. Ind. 402 (2001); Van Santvliet and Ludwig (2004).

[65] Fiscella (2006).

[66] The authors said they also measured drops when dispensed horizontally but did not explain how that would even be possible as the quantity of medication in the bottle decreased.  Van Santvliet and Ludwig say that "[i]n practice, the angle at which the bottle is held varies from 90° to 30°.  Van Santvliet, *Dispensing Eye Drops* (1999) at 194.

But Allergan apparently no longer believes that to be the case.  Thus, in their published paper, the Allergan authors stated:[67]

> Health care providers are urged to instruct glaucoma patients in the most efficient method of instillation for their prostaglandin analogs.  For bimatoprost and latanoprost, the most efficient method is instillation with the bottle held vertically, with 45 degrees nearly as efficient.  For travoprost, the most efficient method is instillation at 45°.

Bimatoprost is the generic name for Allergan's brand-name Lumigan.

152.    On information and belief, Allergan no longer believes that the dispensing angle significantly affects drop size.  This allegation is based on the fact that, although Allergan instructs consumers about obvious aspects of eye drop use, it does not currently instruct consumers about the dispensing angle.  For example, Allergan maintains a web page called, "How to Use Lumigan 0.01% Drops."[68]  That page has detailed instructions and "tips," including such obvious measures as blotting away excess liquid on the skin and waiting until blurry vision clears before driving.  However, the page says nothing about the angle of the bottle, something Allergan would surely include if it believed it was as important and helpful as, for example, telling consumers to wipe away excess liquid and not driving with blurry vision.

### The FDA Does Not Prevent Defendants from Changing the Size of Eye Drops

153.    As the facts alleged in this Complaint demonstrate, a reduction in eye drop size to 15 µL would not have a substantial potential to have an adverse effect on the identity, strength, quality, purity, or potency of the drug product as these factors may relate to the safety or effectiveness of the drug product. Therefore, such a reduction would not be a "major change" requiring prior FDA approval pursuant to 21 C.F.R. § 314.70. Nor does the FDA regulate the

---

[67] Fiscella (2006) at 481.

[68] http://www.lumigan.com/AboutLumigan/UsingDrops.aspx (accessed December 5, 2013).

economics of drug use. For those reasons, the FDA does not require or specifically permit Defendants are to make their eye drops so large that it leads to wastage of medication.

154.    In fact, Defendants have not been constrained by any legal or regulatory restriction of the FDA from changing the sizes of their eye drops.  In fact, in some instances they have changed the sizes of their eye drops significantly and have done so without first obtaining FDA approval, according to documents posted on the FDA's web site.

155.    For example, published studies from 2003 and 2008 show that Merck's Cosopt increased in size over that period from 34 µL (29.2 drops per mL) to 45 µL (22.3 drops per mL).[69]

156.    Those same studies show that Alcon's Azopt drops were substantially smaller than their earlier volume according to FDA documents.  As described above, a 1997 document on the FDA web site contains data that indicate that a drop of Azopt was 50 µL, but Azopt drops were shown to be 40 µL (25.1 drops per mL) in 2003 and were reduced further to 34 µL (29.6 drops per mL) by 2008.[70]

157.    In the case of Alcon's Travatan Z, the drop size according to the FDA's review in 2005, based on what Alcon had told it, was 25 µL.  Nevertheless, just a few years later, Rylander et al.[71] measured the size of Travatan Z drops as 30 µL, meaning that consumers and third-party payors were compelled to pay for 20% more medication than Alcon had stated to the FDA.

158.    The FDA maintains a web site, called "Drugs@FDA," that can be used for "viewing the approval history of a drug."[72]  That web site contains no applications for, or

---

[69] Compare Fiscella et al. (2004) to Rylander (2008).

[70] Compare Fiscella et al. (2004) to Rylander (2008).

[71] Rylander (2008).

[72] *See* http://www.fda.gov/Drugs/InformationOnDrugs/ucm075234.htm#purpose (accessed December 5, 2013).

approvals of, the above changes in drop size of Cosopt, Azopt or Travatan Z.  Thus, FDA approval of those changes was apparently not required.

159.    Nor does the FDA's approval of a product's label, even where the label reflects a certain drop size, mean that the company cannot change the drop size without FDA's prior approval.  This fact is shown by the case of Pfizer's Xalatan.  The FDA's web site contains the approved labels for Xalatan for the period 2001 to the present.[73]  Like the label of every other medication subject to this lawsuit, these labels do not mention the size of the drop, but they are rare examples of labels that contain data from which the size of the drop can be calculated.  Each of those labels states that the amount of the active ingredient in a drop of Xalatan was 1.5 µg and that the concentration of that ingredient in the solution was 50 µg/mL.  If accurate, that would mean that each drop was 30 µL.[74]  However, Fiscella et al.[75] found that Xalatan drops were 20% larger than that at 36 µL, and Rylander et al.[76] found that they were 34 µL.  This also means that amount of medication per Xalatan drop was up to 20% more than the 1.5 µg stated on the Xalatan labels.

160.    Yet Xalatan's label did not change as its drop size changed, and the FDA's Drugs@FDA web site shows no application for, nor FDA approval of, these changes in drop size or in the amount of medication per drop.  Thus, Pfizer was able to change the Xalatan drop size without FDA's prior approval and without changing its label.

---

[73]    *See*    http://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.Label_Approval-History#apphist (accessed December 5, 2013) (search for "Xalatan" to obtain the approved labels).

[74] At 1.5 µg per drop and 50 µg per mL (or 1000 µL), there are 33.3 drops per 1000 µL (50 divided by 1.5).  Dividing 1000 µL by 33.3 drops yields a drop size of 30 µL.

[75] Fiscella (2003).

[76] Rylander (2008)

161.    Based on Xalatan's annual retail sales of $500 million as described above, end payors in the United States paid approximately $60 million in just one year for excess medication from using 34-µL Xalatan drops compared to what they would have paid if the drops had been "only" 30 µL as suggested by the Xalatan label.

162.    Moreover, according to research presented in 2012 to the annual meeting of the Association for Research in Vision and Ophthalmology ("ARVO"), by that year Pfizer had reduced the amount of the active ingredient per drop of Xalatan to 1.13 µg, 25% less than the 1.50 µg shown on the label.[77]  If the amount of the active ingredient in a drop of Xalatan was 1.13 µg and the concentration of the active ingredient remained constant at 50 µg/mL, that means the drop size would have been only 23 µL.  On the other hand, if the drop size had stayed the same, that means that the concentration of the drug in the solution had been reduced below what was set forth on the Xalatan label.

163.    In either case, FDA regulations did not prevent Pfizer from making this change. The FDA's Drugs@FDA web site, which contains applications and approvals for changes in prescription drugs, shows no application by Pfizer, nor approval by the FDA, of these changes in the amount of active ingredient per drop.  If Xalatan could, consistent with its obligations under FDA regulations, make these changes, there is no reason why it could not have reduced the size of the drops further to 15 µL consistent with its obligations under FDA regulations.

164.    Nor are generic eye drops restricted to the same size as their brand-name equivalents.  As the United States Supreme Court stated in *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2575. (2011), with respect to such aspects as a product's label, "generic drug

---

[77] Brian S, Jayat C, Desmis A, *et al.*, Pharmaceutical evaluation of the quality and delivered dose of US latanoprost generics, Abstract presented at ARVO Annual Meeting, 2012.

manufacturers have an ongoing federal duty of 'Sameness.'"  Thus, "[t]o obtain FDA approval, a generic manufacturer must ordinarily show, among other things, that its product has the same active ingredients as an approved brand-name drug; that 'the route of administration, the dosage form, and the strength of the new drug are the same' as the brand-name drug; and that its product is 'bioequivalent' to the brand-name drug. §§ 355(j)(2)(A)(ii), (iii), (iv)."  131 S. Ct. at 2583.

165.    That does not mean, however, that the FDA restricts the drop size of a generic prescription eye drop to be the same as its brand-name equivalent.  In fact, they have been measured in published studies to have substantially different sizes and substantially different dropper tip dimensions.  For example, Fiscella (1999) measured Merck's Timoptic XE as 40 μL and a Falcon generic version of this drug as only 31 μL.

166.    Similarly, a 2011 study by scientists from the University of Toronto and University of Waterloo, Ontario, found Merck's Timoptic XE sold in the United States to be 38 μL and Falcon's generic equivalent to be 24 μL, 37% smaller.[78]  The authors explained the difference by the differing dimensions of the bottles that dispensed these two drugs.  Specifically, they pointed to the differences in the outer orifices of the dropper tips through which the fluid passes because "[t]he larger the outer orifice's diameter, the larger the cross-sectional area available for drop formation and, therefore, the larger the drop size."[79]  They stated: "Outer orifice diameters of Canadian and American brand-name Timoptic XE bottles were approximately 3 times larger than those of the bottles of their generic equivalents; this significant difference helps to explain drop volume variability between the brand-name and the generic products."[80]

---

[78] Zaid N. Mammo et al., Generic Versus Brand-Name North American Topical Glaucoma Drops, 47 Can. J. Ophthalmology 55 (2011).

[79] Id. at 58.

[80] Id. at 57.

167.    Another example of dramatically different bottle designs for a brand-name

product and its generic equivalents can be seen with the glaucoma drug timolol maleate (brand-

name: Timoptic).  Below, taken from the manufacturers' product information on their web sites,

are diagrams of the Timoptic bottle, as well as generic versions sold by Defendant Falcon and a

generic manufacturer named Apotex.

168.    Not only are these bottles visually different, but unlike the other two, the Apotex

bottle has a closed tip with a "spiked" cap that the patient uses to puncture the exit hole.

**<u>TIMOPTIC (BRAND-NAME) BOTTLE</u>**





47



**FALCON'S TIMOLOL MALEATE (GENERIC) BOTTLE**



**APOTEX TIMOLOL MALEATE (GENERIC) BOTTLE**



169.     The above examples demonstrate that changes in dropper tip design and drop size are can be made consistent with FDA regulations.  If generic manufacturers can, pursuant to their FDA regulatory obligations, legally sell prescription eye drops with different bottle designs– as they do – and if they can provide drops that are 37% smaller than the brand-name equivalents of these drugs – as again they do – there is no reason why they, or brand-name manufacturers, could not legally sell their products in bottles that emit 15 µL drops.  Yet, as shown above, they do not.

## CLASS ACTION ALLEGATIONS:

170.     Pursuant to Rule 23 of the Federal Rules of Procedure, Plaintiffs seek certification of the following Classes and Subclasses defined as follows:

171.   **Alcon Class.**  Plaintiffs Cottrell, Henon, Herman, Liggett, Bough, Gillespie, Harrington, Ingino, Rogers, Rusignulolo, Stokes, Layloff, Tate and Renteria seek to represent all persons and entities who fall within one of the following subclasses (for each plaintiff, the respective subclass of his or her state), which collectively constitute the Alcon Class:

All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Alcon in multi-dose dispensers and purchased within the State of New Jersey within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification. ("Alcon New Jersey Sub-Class.")

All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Alcon in multi-dose dispensers and purchased within the State of Illinois within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification.  ("Alcon California Sub-Class.")

All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Alcon in multi-dose dispensers and purchased within the State of Florida within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification.  ("Alcon Florida Sub-Class.")

All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Alcon in multi-dose dispensers and purchased within the State of California within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification. ("Alcon Illinois Sub-Class.")

All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Alcon in multi-dose dispensers and purchased within the State of North Carolina within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification. ("Alcon North Carolina Sub-Class.")

All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Alcon in multi-dose dispensers and purchased within the State of Texas within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification.  ("Alcon Texas Sub-Class.")

Excluded from the Alcon Class and Sub-Classes are officers, directors and employees of Defendants and any entity affiliated with or controlled by Defendants, counsel and members of the immediate families of counsel for Plaintiffs herein, and

the judge presiding over this action and any member of the judge's immediate family.

172.   **Allergan Class.**  Plaintiffs Herman, Reeves, Freburger, Liggett, Bough, Brown, Ingino, Rusignulolo, Stokes, Trocccoli, Whitfield, Tanner and Franco seek to represent all persons and entities who fall within one of the following subclasses (for each plaintiff, the respective subclass of his or her state), which collectively constitute the Allergan Class:

> All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Allergan in multi-dose dispensers and purchased within the State of New Jersey within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification. ("Allergan New Jersey Sub-Class.")

> All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Allergan in multi-dose dispensers and purchased within the State of California within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification. ("Allergan California Sub-Class.")

> All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Allergan in multi-dose dispensers and purchased within the State of Florida within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification. ("Allergan Florida Sub-Class.")

> All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Allergan in multi-dose dispensers and purchased within the State of North Carolina within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification.  ("Allergan North Carolina Sub-Class.")

> All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Allergan in multi-dose dispensers and purchased within the State of Texas within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification. ("Allergan Texas Sub-Class.")

> Excluded from the Allergan Class and Sub-Classes are officers, directors and employees of Defendants and any entity affiliated with or controlled by Defendants, counsel and members of the immediate families of counsel for Plaintiffs herein, and the judge presiding over this action and any member of the judge's immediate family.

51

173.   **Pfizer Class.**  Plaintiffs Nazzal, Gillespie, Layloff, and Sutton seek to represent all persons and entities who fall within one of the following subclasses (for each plaintiff, the respective subclass of his or her state), which collectively constitute the Pfizer Class:

> All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Pfizer in multi-dose dispensers and purchased within the State of California within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification. ("Pfizer California Sub-Class.")

> All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Pfizer in multi-dose dispensers and purchased within the State of Florida within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification.  ("Pfizer Florida Sub-Class.")

> All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Pfizer in multi-dose dispensers and purchased within the State of Illinois within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification.  ("Pfizer Illinois Sub-Class.")

> All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by North Carolina in multi-dose dispensers and purchased within the State of Illinois within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification. ("Pfizer North Carolina Sub-Class.")

> Excluded from the Pfizer Class and Sub-Classes are officers, directors and employees of Defendants and any entity affiliated with or controlled by Defendants, counsel and members of the immediate families of counsel for Plaintiffs herein, and the judge presiding over this action and any member of the judge's immediate family.

174.   **Valeant Defendants Class.**  Plaintiffs Herman, Liggett, Gillespie, Rusignulolo, Whitfield and Lampkin seek to represent all persons and entities who fall within one of the following subclasses (for each plaintiff, the respective subclass of his or her state), which collectively constitute the Valeant Defendants Class:

> All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by the Valeant Defendants in multi-dose dispensers and purchased within the State of California within the period of the

applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification. ("Valeant California Sub-Class.")

All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by the Valeant Defendants in multi-dose dispensers and purchased within the State of Florida within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification. ("Valeant Florida Sub-Class.")

All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by the Valeant Defendants in multi-dose dispensers and purchased within the State of Texas within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification. ("Valeant Texas Sub-Class.")

Excluded from the B+L Class and Sub-Classes are officers, directors and employees of Defendants and any entity affiliated with or controlled by Defendants, counsel and members of the immediate families of counsel for Plaintiffs herein, and the judge presiding over this action and any member of the judge's immediate family.

175. **Merck Class.** Plaintiffs Reeves, Herman, Liggett, Bough, Brown, Rusignulolo,

Troccoli, and seek to represent all persons and entities who fall within one of the following

subclasses (for each plaintiff, the respective subclass of his or her state), all of which collectively

constitute the Merck Class:

All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Merck in multi-dose dispensers and purchased within the State of New Jersey within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification. ("Merck New Jersey Sub-Class.")

All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Merck in multi-dose dispensers and purchased within the State of California within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification. ("Merck California Sub-Class.")

All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Merck in multi-dose dispensers and purchased within the State of Florida within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification. ("Merck Florida Sub-Class.")

Excluded from the Merck Class and Sub-Classes are officers, directors and employees of Defendants and any entity affiliated with or controlled by Defendants, counsel and members of the immediate families of counsel for Plaintiffs herein, and the judge presiding over this action and any member of the judge's immediate family.

176.    **Prasco Class.**  Plaintiffs Reeves, Bough, and Rusignulolo seek to represent all

persons and entities who fall within one of the following Prasco Class:

All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Prasco in multi-dose dispensers and purchased within the State of New Jersey within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification. ("Prasco New Jersey Sub-Class.")

All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured for and sold by Prasco in multi-dose dispensers and purchased within the State of Florida within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification. ("Prasco Florida Sub-Class.")

Excluded from the Prasco Class and Sub-Classes are officers, directors and employees of Defendants and any entity affiliated with or controlled by Defendants, counsel and members of the immediate families of counsel for Plaintiffs herein, and the judge presiding over this action and any member of the judge's immediate family.

177.    **Akorn Class.**  Plaintiffs Herman, Harrington and Rusignulolo seek to represent

all persons and entities who fall within one of the following subclasses (for each plaintiff, the

respective subclass of his or her state), all of which collectively constitute the Akorn Class:

All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Merck in multi-dose dispensers and purchased within the State of California within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification. ("Akorn California Sub-Class.")

All persons and entities who paid all or part of the purchase price of prescription eye drops manufactured and sold by Merck in multi-dose dispensers and purchased within the State of Florida within the period of the applicable statute of limitations prior to the filing of this lawsuit and up to the date of certification.  ("Akorn Florida Sub-Class.")

Excluded from the Akorn Class and Sub-Classes are officers, directors and employees of Defendants and any entity affiliated with or controlled by Defendants, counsel and members of the immediate families of counsel for Plaintiffs herein, and the judge presiding over this action and any member of the judge's immediate family.

178. **Numerosity.** Although the exact size of the Classes is currently unknown to Plaintiffs, the total number of Class Members in each class and subclass is so numerous that joinder of all Class Members would be impracticable. Accordingly, this putative class action satisfies Rule 23(a)(1).

179. **Commonality.** There is a well-defined community of interest in the questions of law and fact affecting Class Members, satisfying Rule 23(a)(2). Among the numerous questions of law or fact common to the Classes are the following:

A.   What is the capacity of the human eye to hold dropped liquid?

B.   When an eye drop that is larger than the capacity of the eye is instilled in the eye, does the amount in excess of 15 μL have any therapeutic effect?

C.   When an eye drop that is larger than the capacity of the eye is instilled in the eye, does the amount in excess of 15 μL go to waste?

D.   Do smaller size drops, on the order of 15 μL, have an efficacy and bioavailability equivalent to larger size drops, without the waste?

E.   Does a portion of an eye drop in excess of 15 or 16 μL leave the eye through the tear duct and enter the systemic circulation without first being metabolically inactivated in the liver, leading to a risk of side effects?

F.   Are drops of 15 or 16 μL preferable to larger drops, as they minimize systemic exposure, toxic side effects, and wastage?

G.   Is there any medically sound reason to dispense eye drops in excess of the capacity of the eye?

H.   Is it feasible to make an eye dropper that will dispense smaller drops than the containers of Defendant's existing ophthalmic products do?

I.   Did each Defendant engage in a scheme to increase its profits by packaging and selling its prescription eye drops in such a way that consumers were forced to buy more product than they needed?

J.      Is it unfair, within the meaning of FDUTPA and the comparable consumer protection statutes of California, Illinois, New Jersey, North Carolina and Texas, to sell a product that, due to the design of its dispenser, will necessarily result in wastage of the product?

K.      Did Defendants' packaging of eye drops in bottles that dispensed drops of a size that was larger than the capacity of the eye cause consumers substantial injury as a result of paying for more medication than they needed and undergoing a risk of adverse health consequences?

L.      Was the injury sustained by consumers from Defendants' packaging of eye drops in bottles that dispensed drops of a size that was larger than the capacity of the eye outweighed by countervailing benefits to consumers or to competition?

M.     Was the injury sustained by consumers from Defendants' packaging of eye drops in bottles that dispensed drops of a size that was larger than the capacity of the eye reasonably avoidable by consumers who used those products?

N.      Are the damages sustained by Class Members measured by what they paid for the portion of eye drops in excess of 16 μL.

O.      Will declaratory and injunctive relief prevent harm caused to members of the Classes going forward?

P.      Did Defendants' act with the malice necessary for the imposition of punitive damages?

Q.      Should Defendants' be required to pay Plaintiffs' attorneys' fees?

180.    **Typicality.** Pursuant to Rule 23(a)(3), the claims of Plaintiffs are typical of the claims of the members of their respective Classes.

181.    **Adequacy of Representation.**  Moreover, as required by Rule 23(a)(4), Plaintiffs are adequate representatives of their respective Classes and have no conflict of interest with other Class Members.  Plaintiffs' counsel are experienced in this type of litigation and will prosecute the action adequately and vigorously on behalf of the Classes.

182.    **Rule 23(b)(2) elements.**  Certification of the Classes is proper under Rule 23(b)(2) because Defendants have acted on grounds that apply generally to the Classes so that

final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

183.    **Predominance.**  Certification of the Classes is proper under Rule 23(b)(3) since questions of law or fact common to each of the Classes predominate over any questions affecting only individual Class Members.  The central issue in this case is common among all Class Members:  whether Defendants' practice of selling prescription eye drops in containers that emit drops in excess of the capacity of the eye violate FDUTPA and the comparable consumer protection statutes of California, Illinois, New Jersey, North Carolina and Texas because they compel all Class Members to pay for product that will be necessarily wasted.  That question predominates over any possible questions affecting only individual Class Members.

184.    **Superiority.**  Further, certification of the Classes is similarly proper under Rule 23(b)(3) since a class action is superior to other available methods for fairly and efficiently adjudicating the controversy because, among other reasons, such treatment will permit a large number of similarly situated persons and entities to prosecute their claims simultaneously and efficiently without the unnecessary duplication of evidence, effort and expense that numerous individual cases would engender.  In addition, the class action mechanism is the only method by which Class Members with small claims could, as a practical matter, seek redress for the wrongs committed by Defendants.  The benefits of class action treatment substantially outweigh the difficulties, if any, that may arise in the management of this case as a class action.  There are no unusual difficulties that might arise in the management of this case as a class action.

185.    Certification of the Classes for purposes of pursuing injunctive relief is proper under Rule 23(b)(2) because Defendants' conduct has affected all members of the Classes in the same manner, and, in the absence of injunctive relief, will continue to do so.  Class Members

have no adequate remedy at law to redress the wrongs which are committed by Defendants on a continuing basis.

### DEFENDANTS' ACTIONS ARE UNFAIR UNDER THE FTC'S INTERPRETATION OF SECTION 5(a) OF THE FTC ACT

186.    As described more fully below, the consumer protection statutes of Florida and the other states encompassed by this lawsuit incorporate the Federal Trade Commission's interpretations of § 5(a) of the Federal Trade Commission ("FTC") Act in their prohibitions, either by statute or case law.  Section 5(a) of the FTC Act declares unlawful "[u]nfair or deceptive acts or practices in or affecting commerce."

187.    Since the 1980s, the FTC has followed its Unfairness Policy Statement, which defines unfairness under the FTC Act in terms of three elements.  Under this standard, "[a]n act or practice is 'unfair' under Section 5 if it 'causes or is likely to cause [1] substantial injury to consumers [2] which is not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or to competition.'"[81]

188.    As described in this Complaint, the consumer injury caused by Defendants' practices of selling topical ophthalmic prescription medication in dispensers that emit excessively large drops satisfies each of the elements necessary to establish an unfair practice.

---

[81] The Structure and Practices of the Debt Buying Industry, 2013 WL 419348 (F.T.C. January 1, 2013) at *8, quoting 15 U.S.C. § 45(n) (codifying the Commission's unfairness analysis); see also Letter from the FTC to Hon. Wendell Ford and Hon. John Danforth, Committee on Commerce, Science and Transportation, United States Senate, Commission Statement of Policy on the Scope of Consumer Unfairness Jurisdiction (December 17, 1980), reprinted in the Appendix to In the Matter of Int'l Harvester Co., 104 F.T.C. 949, 1079, 1074 n.3 (1984) (hereafter "FTC Unfairness Policy Statement") and also available on the FTC's web site at http://www.ftc.gov/bcp/policystmt/ad-unfair.htm.  The FTC and the courts call this letter its "Unfairness Policy Statement" or "Policy Statement on Unfairness."  See id.; Debt Buying Industry, 2013 WL 419348 (F.T.C.) at *8, n. 19; Am. Fin. Servs. Ass'n v. F.T.C., 767 F.2d 957, 970-71 (D.C. Cir. 1985); F.T.C. v. Cantkier, 767 F. Supp. 2d 147, 153 (D.D.C. 2011); F.T.C. v. Accusearch, Inc., 06-CV-105-D, 2007 WL 4356786 at *7 (D. Wyo. Sept. 28, 2007), aff'd, 570 F.3d 1187 (10th Cir. 2009); see also Orkin Exterminating Co., Inc. v. F.T.C., 849 F.2d 1354, 1364 n. 10 (11th Cir. 1988) (referring to the letter as "the FTC's 'Policy Statement' on the meaning of unfair acts and practices").

189.    First, Defendants' practices cause substantial consumer injury for two reasons. As the FTC's Unfairness Policy Statement states, "[i]n most cases a substantial injury involves monetary harm, as when sellers coerce consumers into purchasing unwanted goods or services …."[82] That is precisely what Defendants have done by compelling consumers into purchasing unwanted amounts of prescription eye drops.

190.    Furthermore, the FTC states:  "An injury may be sufficiently substantial … if it does a small harm to a large number of people …."[83]  As shown herein, the harm caused by excessively large eye drops affects millions of consumers who use prescription eye drops.

191.    In addition, the FTC Policy Statement states: "Unwarranted health and safety risks may also support a finding of unfairness."  As described herein, the large sizes of Defendants' prescription eye drops cause unwarranted health and safety risks in the following ways.

192.    First, because the drops are larger than the capacity of the eye to absorb, substantial portions pass through the lacrimal or tear duct and enter the bloodstream without first being metabolically inactivated in the liver.  As a result, patients are placed at an unwarranted risk of systemic toxic side effects, such as bronchospasm, palpitation, reduced blood pressure, slowed heart rate, syncope, exercise intolerance, depression, anxiety, disorientation, confusion, headaches, fatigue, drowsiness, dry mouth and hypertension.  The elderly are at increased risk of at least some of these effects compared to younger individuals.

193.    In addition, the excessive size of prostaglandins such as Alcon's Travatan Z, Allergan's Lumigan and Pfizer's Xalatan increases the risk of local side effects such as

---

[82] FTC Unfairness Policy Statement.

[83] *In the Matter of Int'l Harvester Co*., 104 F.T.C. 949, n. 12 (1984).

lengthening, thickening and hyperpigmentation of eyelashes, darkening of the iris, and hyperpigmentation of the skin around the eye.

194.    Moreover, the size of Defendants' eye drops contributes to a situation where many patients with glaucoma run out of their medication before their insurer or other third-party payor will reimburse them for a replacement bottle.  Because these drugs are so expensive, many patients cannot afford to buy them on their own and therefore go without, placing them at increased risk of loss of vision or complete blindness.

195.    Defendants' practices also meet the second element of the FTC's Unfairness Policy Statement of not being reasonably avoidable by consumers themselves.  As described herein, there are several reasons for this.

196.    First, individual patients do not choose which drugs to take; they are prescribed their drugs by their physicians.  Once the doctor has prescribed a prescription eye drop, the patient has no alternative other than rejecting the physician's advice and foregoing the treatment entirely.

197.    Moreover, consumers cannot avoid product wastage by switching to an alternative product, because all prescription eye drops are substantially larger than 15 μL and therefore lead to wastage.

198.    In addition, it is impossible to instill less than one eye drop into one's eye.  Thus, a consumer must consume the entirety of the excessively large drop supplied by the manufacturer, even though only a portion provides any benefit.

199.    Finally, Defendants' practices meet the third and final element of the FTC's Unfairness Policy Statement in that the consumers' injuries are not outweighed by countervailing

benefits to consumers or competition.  In fact, there are no countervailing benefits to consumers or competition from the excessively large eye drops that Defendants sell.

## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT

200.    According to the Supreme Court of New Jersey, the legislature of that state intended the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. § 56:8-1 *et seq*, to be "one of the strongest consumer protection laws in the nation."  *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 15, 647 A.2d 454, 460 (1994).  The NJCFA declares to be unlawful "the use or employment by any person of any unconscionable commercial practice … in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby …."  N.J. Stat. Ann. § 56:8-2.

201.    Section 19 of the Act provides a private right of action, with damages automatically trebled, to "[a]ny person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act ...."  N.J.S.A. § 56:8-19.  "In any action under this section the court shall, in addition to any other appropriate legal or equitable relief, award threefold the damages sustained by any person in interest.  In all actions under this section, … the court shall also award reasonable attorneys' fees, filing fees and reasonable costs of suit."  *Id.*

202.    Defendants violated the NJCFA by selling prescription eye drop medications in dispensers that emit drops that are so large that they exceed the capacity of the eye, with large portions being expelled from the eye and providing no pharmaceutical benefit and a risk of harm. As a result of these actions, patients, including the New Jersey Plaintiffs and Class Members, suffered ascertainable loss of moneys or property in having to spend substantial sums on medication that was unwanted and unneeded.

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

203.     The California Unfair Competition Law ("UCL") outlaws "any unlawful, unfair or fraudulent business act or practice …."  Cal. Bus. & Prof. Code § 17200.

204.     Defendants have violated the unlawful prong of the UCL by violating Section 5(a) of the FTC Act because, as set forth above, their practices alleged herein cause substantial injury which is not outweighed by any countervailing benefits to consumers or competition and is one that consumers could not have reasonably avoided.

205.     Defendants' conduct as alleged herein has violated the unfairness prong of the UCL.  California courts have set out several definitions of unfairness; Defendants' conduct  is unfair under each of them:

> A.     "[T]he consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided." See *Daugherty v. American Honda Motor Co., Inc*. (2006) 144 Cal.App.4th 824, 839, 51 Cal.Rptr.3d 118.)

> B.     Defendants' conduct "offends an established public policy [the FTC Policy Statement on Unfairness] or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  *See West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 806, 154 Cal. Rptr. 3d 285, 305 (2013), *quoting Smith v. State Farm Mut. Auto. Ins. Co*., 93 Cal. App. 4th 700, 719, 113 Cal. Rptr. 2d 399, 415 (2001),

> C.     Plaintiffs' claim is predicated upon public policy which is "'tethered' to specific constitutional, statutory or regulatory provisions."  *See West,* 214 Cal. App. at 806, 154 Cal. Rptr.3d at 305, *quoting Scripps Clinic v. Superior Court*, 108 Cal.App.4th 917, 940, 134 Cal.Rptr.2d 101 (2003).

206.     Pursuant to Cal. Bus. & Prof. Code § 17203, the court may "restore to any person in interest any money or property, real or personal, which may have been acquired by means of" a violation of the statute."

207.     Defendants violated the California UCL by selling prescription eye drop medications in dispensers that emit drops that are so large that they exceed the capacity of the eye, with large portions being expelled from the eye and providing no pharmaceutical benefit

and a risk of harm.  By means of those violations, Defendants acquired interests in money and property as a result of patients, including Class Members, having to spend substantial sums of money on medication that is unwanted and unneeded.

208.    In addition, pursuant to Cal. Civ. Proc. Code § 1021.5, the court "may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement … are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

## VIOLATIONS OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

209.    FDUTPA prohibits "[u]nfair or deceptive acts or practices in the conduct of any trade or commerce …."  Fla. Stat. § 501.204 (1).

210.    In outlawing unfair acts or practices, the Florida Legislature adopted the FTC's interpretations of § 5(a)(1) of the Federal Trade Commission Act.  Fla. Stat. § 501.204 (2).  The Legislature specifically stated that a violation of FDUTPA "may be based upon … [t]he standards of unfairness … set forth and interpreted by the Federal Trade Commission …."  Fla. Stat. § 501.203 (3)(b).

211.    FDUTPA provides that "[a]nyone  aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part."  Fla. Stat. § 501.211 (1).

63

212.    The Florida Legislature has provided that a person who has suffered a loss as a result of a violation of FDUTPA may recover actual damages, plus attorney's fees and court costs.  § 501.211(2).

213.    Defendants violated FDUTPA by selling prescription eye drop medications in dispensers that emit drops that are so large that they exceed the capacity of the eye, with large portions being expelled from the eye and providing no pharmaceutical benefit and a risk of harm, causing patients, including the Florida Plaintiffs and Class Members, to spend substantial sums of money on medication that is unwanted and unneeded.

214.    Defendants' actions, as alleged herein, were performed intentionally, willfully, knowingly, and maliciously.

## <u>VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT</u>

215.    Section 2 of the Illinois Consumer Fraud Act ("ICFA") prohibits "unfair acts or practices…in the conduct of any trade or commerce…" 815 ILCS 505/2.

216.    That section also provides:   "In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act." 815 ILCS 505/2.

217.    The ICFA allows "[a]ny person who suffers actual damage as a result of a violation of this Act committed by any other person [to] bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper…." 815 ILCS 505/10a.

218.    Defendants Alcon and Pfizer violated ICFA by selling prescription eye drop medications in dispensers that emit drops that are so large that they exceed the capacity of the eye, with large portions being expelled from the eye and providing no pharmaceutical benefit and a risk of harm.   As a result of those violations, patients, including Plaintiff Layoff and Class

Members, suffered actual damage in the form of substantial sums of money spent on medication that was unwanted and unneeded.

219.   Defendant's actions, as alleged herein, were performed intentionally, willfully, knowingly, and maliciously.

## VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT

220.   In language reproduced verbatim from Section 5(a)(1) of the FTC Act, the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"), N.C.G.S. §75-1.1, *et seq*., prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce …." N.C.G.S. § 75-1.1(a).  This statute is "the North Carolina analogue of section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45." *Hester v. Martindale-Hubbell, Inc*., 659 F.2d 433, 435 (4th Cir. 1981).  "[T]he [North Carolina] "legislature adopted N.C.G.S. § 75–1.1 'to parallel and supplement the FTC Act.'" *Hageman v. Twin City Chrysler-Plymouth Inc.*, 681 F. Supp. 303, 305 (M.D.N.C. 1988), *quoting Marshall v. Miller,* 302 N.C. 539, 543, 276 S.E.2d 397, 400 (1981).

221.   Section 75-16 of the NCUDTPA provides injured persons with a private right of action and automatic trebling of damages:  "If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict."  N.C.G.A. § 75-16.

222.   Alcon, Allergan and Pfizer violated the NCUDTPA by selling prescription eye drop medications in dispensers that emit drops that are so large that they exceed the capacity of

the eye, with large portions being expelled from the eye and providing no pharmaceutical benefit and a risk of harm.   By reason of these actions, patients, including the North Carolina Plaintiffs and Class Members, suffered injury by having to spend substantial sums on medication that was unwanted and unneeded.

223.   These Defendants' actions, as alleged herein, were performed intentionally, willfully, knowingly, and maliciously.

## VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT

224.   The Texas Deceptive Trade Practices Act ("DTPA")  provides:

(a)  A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish:

*   *   *

(3) any unconscionable action or course of action by any person ….

*   *   *

(b) In a suit filed under this section, each consumer who prevails may obtain:

(1) the amount of economic damages found by the trier of fact. If the trier of fact finds that the conduct of the defendant was committed knowingly, the consumer may also recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of economic damages; or if the trier of fact finds the conduct was committed intentionally, the consumer may recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of damages for mental anguish and economic damages;

*   *   *

d) Each consumer who prevails shall be awarded court costs and reasonable and necessary attorneys' fees.

Tex. Bus. & Com. Code § 17.50.

225.   Texas courts define an unconscionable act as "one that takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a 'grossly unfair degree,' or which

results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration." *Brennan v. Manning*, 07-06-0041-CV, 2007 WL 1098476, at *5 (Tex. App. Apr. 12, 2007);  *see also Robinson v. Match.com, L.L.C.*, 3:10-CV-2651-L, 2012 WL 5007777, at *4 (N.D. Tex. Oct. 17, 2012), *aff'd sub nom. Malsom v. Match.com, L.L.C.*, 540 F. App'x 412 (5th Cir. 2013); *McPeters v. LexisNexis*, 910 F. Supp. 2d 981, 988 (S.D. Tex. 2012).

226.    Alcon, Allergan and Valeant Defendants violated the Texas DTPA by committing the unconscionable acts of selling prescription eye drop medications in dispensers that emit drops that are so large that they exceed the capacity of the eye, with large portions being expelled from the eye and providing no pharmaceutical benefit and a risk of harm.  In committing those acts these Defendants took advantage of the lack of knowledge, ability, experience or capacity of Texas consumers, including the Texas Plaintiffs and Class Members to a grossly unfair degree because, as described above, their injury was not reasonably avoidable.  In addition, these acts resulted in a gross disparity between the value received and consideration paid by consumers, including the Texas Plaintiffs and Class Members, in a transaction involving transfer of consideration for the purchase of Defendants' prescription eye drops.  By reason of these actions, patients, including the Texas Plaintiffs and Class Members, suffered injury by having to spend substantial sums on medication that was unwanted and unneeded.

227.    Defendants' acts were committed knowingly and intentionally.

228.    Tex. Bus. & Com. Code§ 17.505 provides that "[a]s a prerequisite to filing a suit seeking damages under [the Texas DTPA], a consumer shall give written notice to the person at least 60 days before filing the suit advising the person in reasonable detail of the consumer's specific complaint and the amount of economic damages, damages for mental anguish, and

67

expenses, including attorneys' fees, if any, reasonably incurred by the consumer in asserting the claim against the defendant." Tex. Bus. & Com. Code § 17.505. However, this prerequisite does not apply "[i]f the giving of 60 days' written notice is rendered impracticable by reason of the necessity of filing suit in order to prevent the expiration of the statute of limitations …." Tex. Bus. & Com. Code § 17.505.

## COUNT I:  ALCON'S VIOLATIONS OF NJCFA
(Plaintiffs Cottrell and Henon)

229.    Plaintiffs Cottrell and Henon reallege and incorporate by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

230.    Defendant Alcon has marketed and sold prescription eye drops within the State of New Jersey to consumers with the knowledge that the bottle used to apply said eye drops dispensed drops far larger than the capacity of the human eye to accept.  Despite this knowledge, the Defendant marketed and sold this product during the applicable class period and continues to do so at the present time.

231.    Plaintiffs Cottrell and Henon allege that in violation of N.J.S.A. § 56:8-2 Defendant has engaged in an unconscionable commercial practice in connection with the prescription eye drops in question.

232.    Plaintiffs Cottrell and Henon and other Alcon New Jersey Class Members suffered an ascertainable loss as a result of the unlawful acts complained of herein and are therefore entitled to the relief afforded by N.J.S.A. § 56:8-19.

233.    This ascertainable loss resulted from the purchase by Plaintiffs Cottrell and Henon and other Alcon New Jersey Class Members of the prescription eye drops marketed and sold by Defendant Alcon in the State of New Jersey.  This loss is a result of money paid for such

pharmaceuticals that were wasted because the eye drops were larger than the capacity of the human eye.

234.     The amount of loss can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Alcon that exceeded a drop of 16 µL.  For example, if a Class Member paid for medication the drops of which were 32 µL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

235.     Injunctive relief is necessary and proper to compel Alcon to cease its unfair and unconscionable acts and practices, as alleged herein.

WHEREFORE, Plaintiffs Cottrell and Henon pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT II:  ALLERGAN'S VIOLATIONS OF NJCFA
(Plaintiff Reeves)

236.     Plaintiff Reeves realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

237.     Defendant Allergan has marketed and sold prescription eye drops within the State of New Jersey to consumers with the knowledge that the bottle used to apply said eye drops dispensed drops far larger than the capacity of the human eye to accept.  Despite this knowledge, the Defendant marketed and sold this product during the applicable class period and continues to do so at the present time.

238.     Plaintiff Reeves alleges that in violation of N.J.S.A. § 56:8-2 Defndant has engaged in an unconscionable commercial practice in connection with the prescription eye drops in question.

239.     Plaintiff Reeves and other Allergan New Jersey Class Members suffered an ascertainable loss as a result of the unlawful acts complained of herein and are therefore entitled to the relief afforded by N.J.S.A. § 56:8-19..

240.     Such sums can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Allergan that exceeded a drop of 16 µL.  For example, if a Class Member paid for medication the drops of which were 36 µL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

241.     Injunctive relief is necessary and proper to compel Allergan to cease its unfair and unconscionable acts and practices, as alleged herein.

WHEREFORE, Plaintiff Reeves prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT III:  PRASCO'S VIOLATIONS OF NJCFA
### (Plaintiff Reeves)

242.     Plaintiff Reeves realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

243.     Defendant Prasco has marketed and sold prescription eye drops within the State of New Jersey to consumers with the knowledge that the bottle used to apply said eye drops dispensed drops far larger than the capacity of the human eye to accept.  Despite this knowledge, the Defendant marketed and sold this product during the applicable class period and continues to do so at the present time..

244.     Plaintiff Reeves and Prasco New Jersey Class Members allege that in violation of N.J.S.A. § 56:8-2 Defndant has engaged in an unconscionable commercial practice in connection with the prescription eye drops in question..

245.    Plaintiff Reeves and other Prasco New Jersey Class Members suffered an ascertainable loss as a result of the unlawful acts complained of herein and are therefore entitled to the relief afforded by N.J.S.A. § 56:8-19..

246.    The amount of loss can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Prasco that exceeded a drop of 16 µL.  For example, if a Class Member paid for medication the drops of which were 32 µL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

247.    Injunctive relief is necessary and proper to compel Prasco to cease its unfair and unconscionable acts and practices, as alleged herein.

WHEREFORE, Plaintiff Reeves prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT IV:  MERCK'S VIOLATIONS OF NJCFA
### (Plaintiff Reeves)

248.    Plaintiff Reeves realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

249.    Defendant Merck has marketed and sold prescription eye drops within the State of New Jersey to consumers with the knowledge that the bottle used to apply said eye drops dispensed drops far larger than the capacity of the human eye to accept.  Despite this knowledge, the Defendant marketed and sold this product during the applicable class period and continues to do so at the present time..

250.    Plaintiff Reeves and Merck New Jersey Class Members allege that in violation of N.J.S.A. § 56:8-2 Defndant has engaged in an unconscionable commercial practice in connection with the prescription eye drops in question..

71

251.    Plaintiff Reeves and other Merck New Jersey Class Members suffered an ascertainable loss as a result of the unlawful acts complained of herein and are therefore entitled to the relief afforded by N.J.S.A. § 56:8-19..

252.    The amount of loss can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Merck that exceeded a drop of 16 µL.  For example, if a Class Member paid for medication the drops of which were 32 µL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

253.    Injunctive relief is necessary and proper to compel Merck to cease its unfair and unconscionable acts and practices, as alleged herein.

WHEREFORE, Plaintiff Reeves prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT V:  ALCON'S VIOLATIONS OF THE CALIFORNIA UCL
(Plaintiff Herman)

254.    Plaintiff Herman realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

255.    The acts and practices of Alcon alleged herein violate the California UCL, Cal. Bus. & Prof. Code § 17200, *et seq.*

256.    These acts and practices violate Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1) and therefore violate the unlawful prong of the UCL.

257.    These acts and practices are unfair under the California UCL and under the FTC's interpretation of Section 5(a)(1) of the Federal Trade Commission Act, as set forth in the FTC's Policy Statement on Unfairness, and therefore violate the unfairness prong of the UCL.

258.    These acts and practices of Alcon violate established public policy as expressed, *inter alia*, by the FTC's Policy Statement on Unfairness.

259.    These acts and practices of Alcon are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers

260.    The consumer injury resulting from Alcon's acts and practices is substantial, not outweighed by any countervailing benefits to consumers or to competition, and not an injury the consumers themselves could reasonably have avoided.

261.    Plaintiff Herman and Alcon California Class Members purchased prescription eye drops manufactured and sold by Alcon and are thereby entitled to have restored to themselves sums of money or property spent on medication that was unwanted and unneeded and acquired by Alcon by means of their violations of the California UCL.  Such sums were in the form of amounts that Plaintiff Herman and Alcon California Class Members paid for such pharmaceuticals that were wasted because the drops were larger than the capacity of the human eye.

262.    Such sums can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Alcon that exceeded a drop of 16 µL, the drop size used in the Vocci study.  For example, if a Class Member paid for medication the drops of which were 32 µL, the amount to which they are entitled to be restored is equal to half the amount that they paid for the medication.

263.    Injunctive relief is necessary and proper to compel Alcon to cease its illegal acts and practices, as alleged herein.

WHEREFORE, Plaintiff Herman and Alcon California Plaintiffs pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT VI: ALLERGAN'S VIOLATIONS OF THE CALIFORNIA UCL
### (Plaintiff Herman)

264. Plaintiff Herman realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

265. The acts and practices of Allergan alleged herein violate the California UCL, Cal. Bus. & Prof. Code § 17200, *et seq.*

266. These acts and practices violate Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1) and therefore violate the unlawful prong of the UCL.

267. These acts and practices are unfair under the California UCL and under the FTC's interpretation of Section 5(a)(1) of the Federal Trade Commission Act, as set forth in the FTC's Policy Statement on Unfairness, and therefore violate the unfairness prong of the UCL.

268. These acts and practices of Allergan violate established public policy as expressed, *inter alia*, by the FTC's Policy Statement on Unfairness.

269. These acts and practices of Allergan are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers

270. The consumer injury resulting from Allergan's acts and practices is substantial, not outweighed by any countervailing benefits to consumers or to competition, and not an injury the consumers themselves could reasonably have avoided.

271. Plaintiff Herman and Allergan California Class Members purchased prescription eye drops manufactured and sold by Allergan and are thereby entitled to have restored to themselves sums of money or property spent on medication that was unwanted and unneeded and acquired by Allergan by means of their violations of the California UCL. Such sums were in the form of amounts that Plaintiff Herman and Allergan California Class Members paid for such

pharmaceuticals that were wasted because the drops were larger than the capacity of the human eye.

272.    Such sums can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Allergan that exceeded a drop of 16 µL.  For example, if a Class Member paid for medication the drops of which were 32 µL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

273.    Injunctive relief is necessary and proper to compel Allergan to cease its illegal acts and practices, as alleged herein.

WHEREFORE, Plaintiff Herman and Allergan California Plaintiffs pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

### COUNT VII:  PFIZER'S VIOLATIONS OF THE CALIFORNIA UCL
(Plaintiff Nazzal)

274.    Plaintiff Nazzal realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

275.    The acts and practices of Pfizer alleged herein violate the California UCL, Cal. Bus. & Prof. Code § 17200, *et seq.*

276.    These acts and practices violate Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1) and therefore violate the unlawful prong of the UCL.

277.    These acts and practices are unfair under the California UCL and under the FTC's interpretation of Section 5(a)(1) of the Federal Trade Commission Act, as set forth in the FTC's Policy Statement on Unfairness, and therefore violate the unfairness prong of the UCL.

278.    These acts and practices of Pfizer violate established public policy as expressed, *inter alia*, by the FTC's Policy Statement on Unfairness.

279. These acts and practices of Pfizer are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers

280. The consumer injury resulting from Pfizer's acts and practices is substantial, not outweighed by any countervailing benefits to consumers or to competition, and not an injury the consumers themselves could reasonably have avoided.

281. Plaintiff Nazzal and Pfizer California Class Members purchased prescription eye drops manufactured and sold by Pfizer and are thereby entitled to have restored to themselves sums of money or property spent on medication that was unwanted and unneeded and acquired by Pfizer by means of their violations of the California UCL. Such sums were in the form of amounts that Plaintiff Nazzal and Pfizer California Class Members paid for such pharmaceuticals that were wasted because the drops were larger than the capacity of the human eye.

282. Such sums can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Pfizer that exceeded a drop of 16 µL. For example, if a Class Member paid for medication the drops of which were 32 µL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

283. Injunctive relief is necessary and proper to compel Pfizer to cease its illegal acts and practices, as alleged herein.

WHEREFORE, Plaintiff Nazzal and Pfizer California Plaintiffs pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT VIII: VALEANT DEFENDANTS' VIOLATIONS OF THE CALIFORNIA UCL
(Plaintiff Herman)

284. Plaintiff Herman realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

76

285.    The acts and practices of the Valeant Defendants alleged herein violate the California UCL, Cal. Bus. & Prof. Code § 17200, *et seq.*

286.    These acts and practices violate Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1) and therefore violate the unlawful prong of the UCL.

287.    These acts and practices are unfair under the California UCL and under the FTC's interpretation of Section 5(a)(1) of the Federal Trade Commission Act, as set forth in the FTC's Policy Statement on Unfairness and therefore violate the unfairness prong of the UCL.

288.    These acts and practices of the Valeant Defendants violate established public policy as expressed, *inter alia*, by the FTC's Policy Statement on Unfairness.

289.    These acts and practices of the Valeant Defendants are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers

290.    The consumer injury resulting from the Valeant Defendants' acts and practices is substantial, not outweighed by any countervailing benefits to consumers or to competition, and not an injury the consumers themselves could reasonably have avoided.

291.    Plaintiff Herman and the Valeant California Class Members purchased prescription eye drops manufactured and sold by Valeant Defendants and are thereby entitled to have restored to themselves sums of money or property spent on medication that was unwanted and unneeded and acquired by Valeant Defendants by means of their violations of the California UCL.  Such sums were in the form of amounts that Plaintiff Herman and Valeant Defendants California Class Members paid for such pharmaceuticals that were wasted because the drops were larger than the capacity of the human eye.

292.    Such sums can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Valeant that

exceeded a drop of 16 µL.  For example, if a Class Member paid for medication the drops of which were 32 µL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

293.    Injunctive relief is necessary and proper to compel the Valeant Defendants to cease its illegal acts and practices, as alleged herein.

WHEREFORE, Plaintiff Herman and the Valeant Defendants California Plaintiffs pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT IX:  MERCK'S VIOLATIONS OF THE CALIFORNIA UCL
### (Plaintiff Herman)

294.    Plaintiff Herman realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

295.    The acts and practices of Merck alleged herein violate the California UCL, Cal. Bus. & Prof. Code § 17200, *et seq.*

296.    These acts and practices violate Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1) and therefore violate the unlawful prong of the UCL.

297.    These acts and practices are unfair under the California UCL and under the FTC's interpretation of Section 5(a)(1) of the Federal Trade Commission Act, as set forth in the FTC's Policy Statement on Unfairness, and therefore violate the unfairness prong of the UCL.

298.    These acts and practices of Merck violate established public policy as expressed, *inter alia*, by the FTC's Policy Statement on Unfairness.

299.    These acts and practices of Merck are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers

300.    The consumer injury resulting from Merck's acts and practices is substantial, not outweighed by any countervailing benefits to consumers or to competition, and not an injury the consumers themselves could reasonably have avoided.

301.    Plaintiff Herman and Merck California Class Members purchased prescription eye drops manufactured and sold by Merck and are thereby entitled to have restored to themselves sums of money or property spent on medication that was unwanted and unneeded and acquired by Merck by means of their violations of the California UCL.  Such sums were in the form of amounts that Plaintiff Herman and Merck California Class Members paid for such pharmaceuticals that were wasted because the drops were larger than the capacity of the human eye.

302.    Such sums can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Merck that exceeded a drop of 16 µL.  For example, if a Class Member paid for medication the drops of which were 32 µL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

303.    Injunctive relief is necessary and proper to compel Merck to cease its illegal acts and practices, as alleged herein.

WHEREFORE, Plaintiff Herman and Merck California Plaintiffs pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT X:  AKORN'S VIOLATIONS OF THE CALIFORNIA UCL
(Plaintiff Herman)

304.    Plaintiff Herman realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

305. The acts and practices of Akorn alleged herein violated the California UCL, Cal. Bus. & Prof. Code § 17200, *et seq.*

306. These acts and practices violate Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1) and therefore violate the unlawful prong of the UCL.

307. These acts and practices are unfair under the California UCL and under the FTC's interpretation of Section 5(a)(1) of the Federal Trade Commission Act, as set forth in the FTC's Policy Statement on Unfairness and therefore violate the unfairness prong of the UCL.

308. These acts and practices of Akorn violate established public policy as expressed, *inter alia*, by the FTC's Policy Statement on Unfairness.

309. These acts and practices of Akorn are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers

310. The consumer injury resulting from Akorn's acts and practices is substantial, not outweighed by any countervailing benefits to consumers or to competition, and not an injury the consumers themselves could reasonably have avoided.

311. Plaintiff Herman and Akorn California Class Members purchased prescription eye drops manufactured and sold by Akorn and are thereby entitled to have restored to themselves sums of money or property spent on medication that was unwanted and unneeded and acquired by Akorn by means of their violations of the California UCL. Such sums were in the form of amounts that Plaintiff Herman and Akorn California Class Members paid for such pharmaceuticals that were wasted because the drops were larger than the capacity of the human eye.

312. Such sums can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Akorn that

exceeded a drop of 16 µL.  For example, if a Class Member paid for medication the drops of which were 32 µL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

313.    Injunctive relief is necessary and proper to compel Akorn to cease its illegal acts and practices, as alleged herein.

WHEREFORE, Plaintiff Herman and Akorn California Plaintiffs pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT XI:  ALCON'S VIOLATIONS OF FDUTPA
(Plaintiffs Liggett, Bough, Gillespie, Harrington, Ingino, Rogers, Rusignulolo, and Stokes)

314.    Plaintiffs Liggett, Bough, Gillespie, Harrington, Ingino, Rogers, Rusignulolo, and Stokes ("Alcon Florida Plaintiffs") reallege and incorporate by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

315.    The acts and practices of Alcon alleged herein are unfair in violation of FDUPTA, Fla. Stat. § 501.204 (1).

316.    These acts and practices are unfair under the FTC's interpretation of Section 5(a)(1) of the Federal Trade Commission Act, as set forth in the FTC's Policy Statement on Unfairness.

317.    These acts and practices of Alcon violate established public policy as expressed, *inter alia*, by the FTC's Policy Statement on Unfairness.

318.    These acts and practices are unfair, in violation of the cited statutes, because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

319.    Alcon Florida Plaintiffs and Alcon Florida Class Members purchased prescription eye drops manufactured and sold by Alcon and thereby sustained damages as a result of Alcon's

violations of FDUTPA.  Such damages were in the form of amounts that Alcon Florida Plaintiffs and Class Members paid for such pharmaceuticals that were wasted because the drops were larger than the capacity of the human eye.

320.    Such sums can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Alcon that exceeded a drop of 16 µL.  For example, if a Class Member paid for medication the drops of which were 32 µL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

321.    Alcon's actions, as alleged herein, were performed intentionally, willfully, knowingly, and maliciously.

322.    Injunctive relief is necessary and proper to compel Alcon to cease its unfair and unconscionable acts and practices, as alleged herein.

WHEREFORE, Alcon Florida Plaintiffs pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

### COUNT XII:  ALLERGAN'S VIOLATIONS OF FDUTPA
(Plaintiffs Freburger, Liggett, Bough, Brown, Ingino, Rusignulolo, Stokes, Troccoli, and Whitfield)

323.    Plaintiffs Freburger, Liggett, Bough, Brown, Ingino, Rusignulolo, Stokes, Troccoli, and Whitfield ("Allergan Florida Plaintiffs") reallege and incorporate by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

324.    The acts and practices of Allergan alleged herein alleged herein are unfair in violation of FDUPTA, Fla. Stat. § 501.204 (1)

325.    These acts and practices are unfair under the FTC's interpretation of Section 5(a)(1) of the Federal Trade Commission Act, as set forth in the FTC's Policy Statement on Unfairness.

82

326.    These acts and practices of Allergan violate established public policy as expressed, *inter alia*, by the FTC's Policy Statement on Unfairness.

327.    These acts and practices are unfair, in violation of the cited statutes, because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

328.    Allergan Florida Plaintiffs and Allergan Class Members purchased prescription eye drops manufactured and sold by Allergan and thereby sustained damages as a result of Allergan's violations of FDUTPA. Such damages were in the form of amounts that Allergan Florida Plaintiffs and Class Members paid for such pharmaceuticals that were wasted because the drops were larger than the capacity of the human eye.

329.    Such sums can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Allergan that exceeded a drop of 16 µL. For example, if a Class Member paid for medication the drops of which were 32 µL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

330.    Allergan's actions, as alleged herein, were performed intentionally, willfully, knowingly, and maliciously.

331.    Injunctive relief is necessary and proper to compel Allergan to cease its unfair and unconscionable acts and practices, as alleged herein.

WHEREFORE, Allergan Florida Plaintiffs pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT XIII:  PFIZER'S VIOLATIONS OF FDUTPA
### (Plaintiff Gillespie)

332.    Plaintiff Gillespie realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

333.    The acts and practices of Pfizer alleged herein alleged herein are unfair in violation of FDUPTA, Fla. Stat. § 501.204 (1).

334.    These acts and practices are unfair under the FTC's interpretation of Section 5(a)(1) of the Federal Trade Commission Act, as set forth in the FTC's Policy Statement on Unfairness.

335.    These acts and practices of Pfizer violate established public policy as expressed, *inter alia*, by the FTC's Policy Statement on Unfairness.

336.    These acts and practices are unfair, in violation of the cited statutes, because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

337.    Plaintiff Gillespie and Pfizer Class Members purchased prescription eye drops manufactured and sold by Pfizer and thereby sustained damages as a result of Pfizer's violations of FDUTPA.  Such damages were in the form of amounts that Plaintiff Gillespie and Class Members paid for such pharmaceuticals that were wasted because the drops were larger than the capacity of the human eye.

338.    Such sums can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Pfizer that exceeded a drop of 16 μL.  For example, if a Class Member paid for medication the drops of which were 32 μL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

339.    Pfizer's actions, as alleged herein, were performed intentionally, willfully, knowingly, and maliciously.

340.    Injunctive relief is necessary and proper to compel Pfizer to cease its unfair and unconscionable acts and practices, as alleged herein.

WHEREFORE, Plaintiff Gillespie prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT XIV:  THE VALEANT DEFENDANTS' VIOLATIONS OF FDUTPA
(Plaintiffs Liggett, Gillespie, Rusignulolo, and Whitfield)

341.    Plaintiffs Liggett, Gillespie, Rusignulolo, and Whitfield ("Valeant Florida Plaintiffs") reallege and incorporate by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

342.    The acts and practices of the Valeant Defendants alleged herein alleged herein are unfair in violation of FDUPTA, Fla. Stat. § 501.204 (1).

343.    These acts and practices are unfair under the FTC's interpretation of Section 5(a)(1) of the Federal Trade Commission Act, as set forth in the FTC's Policy Statement on Unfairness.

344.    These acts and practices of the Valeant Defendants violate established public policy as expressed, *inter alia*, by the FTC's Policy Statement on Unfairness.

345.    These acts and practices are unfair, in violation of the cited statutes, because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

346.    Valeant Florida Plaintiffs and Valeant Class Members purchased prescription eye drops manufactured and sold by the Valeant Defendants and thereby sustained damages as a result of the Valeant Defendants' violations of FDUTPA. Such damages were in the form of

85

amounts that Valeant Florida Plaintiffs and Class Members paid for such pharmaceuticals that were wasted because the drops were larger than the capacity of the human eye.

347.    Such sums can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Valeant that exceeded a drop of 16 µL.  For example, if a Class Member paid for medication the drops of which were 32 µL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

348.    The Valeant Defendants' actions, as alleged herein, were performed intentionally, willfully, knowingly, and maliciously.

349.    Injunctive relief is necessary and proper to compel the Valeant Defendants to cease its unfair and unconscionable acts and practices, as alleged herein.

WHEREFORE, Valeant Florida Plaintiffs pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

### COUNT XV:  MERCK'S VIOLATIONS OF FDUTPA
(Plaintiffs Liggett, Bough, Brown, Rusignulolo, and Troccoli)

350.    Plaintiffs Liggett, Bough, Brown, Rusignulolo, and Troccoli ("Merck Florida Plaintiffs") reallege and incorporate by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

351.    The acts and practices of Merck alleged herein alleged herein are unfair in violation of FDUPTA, Fla. Stat. § 501.204 (1).

352.    These acts and practices are unfair under the FTC's interpretation of Section 5(a)(1) of the Federal Trade Commission Act, as set forth in the FTC's Policy Statement on Unfairness.

353.    These acts and practices of Merck violate established public policy as expressed, *inter alia*, by the FTC's Policy Statement on Unfairness.

354.    These acts and practices are unfair, in violation of the cited statutes, because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

355.    Merck Florida Plaintiffs and Merck Class Members purchased prescription eye drops manufactured and sold by Merck and thereby sustained damages as a result of Merck's violations of FDUTPA.  Such damages were in the form of amounts that Merck Florida Plaintiffs and Class Members paid for such pharmaceuticals that were wasted because the drops were larger than the capacity of the human eye.

356.    Such sums can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Merck that exceeded a drop of 16 μL.  For example, if a Class Member paid for medication the drops of which were 32 μL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

357.    Merck's actions, as alleged herein, were performed intentionally, willfully, knowingly, and maliciously.

358.    Injunctive relief is necessary and proper to compel Merck to cease its unfair and unconscionable acts and practices, as alleged herein.

WHEREFORE, Merck Florida Plaintiffs pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT XVI:  PRASCO'S VIOLATIONS OF FDUTPA
(Plaintiffs Bough and Rusignulolo)

359.    Plaintiffs Bough and Rusignulolo ("Prasco Plaintiffs") reallege and incorporate by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

360.    The acts and practices of Prasco alleged herein alleged herein are unfair in violation of FDUPTA, Fla. Stat. § 501.204 (1).

361.    These acts and practices are unfair under the FTC's interpretation of Section 5(a)(1) of the Federal Trade Commission Act, as set forth in the FTC's Policy Statement on Unfairness.

362.    These acts and practices of Prasco violate established public policy as expressed, *inter alia*, by the FTC's Policy Statement on Unfairness.

363.    These acts and practices are unfair, in violation of the cited statutes, because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

364.    Prasco Plaintiffs and Prasco Class Members purchased prescription eye drops manufactured and sold by Prasco and thereby sustained damages as a result of Prasco's violations of FDUTPA.  Such damages were in the form of amounts that Prasco Plaintiffs and Class Members paid for such pharmaceuticals that were wasted because the drops were larger than the capacity of the human eye.

365.    Such sums can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Prasco that exceeded a drop of 16 µL.  For example, if a Class Member paid for medication the drops of which were 32 µL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

88

366.     Prasco's actions, as alleged herein, were performed intentionally, willfully, knowingly, and maliciously.

367.     Injunctive relief is necessary and proper to compel Prasco to cease its unfair and unconscionable acts and practices, as alleged herein.

WHEREFORE, Prasco Plaintiffs pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

<u>COUNT XVII:  AKORN'S VIOLATIONS OF FDUTPA</u>
(Plaintiffs Harrington and Rusignulolo)

368.     Plaintiffs Harrington and Rusignulolo ("Akorn Plaintiffs") reallege and incorporate by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

369.     The acts and practices of Akorn alleged herein alleged herein are unfair in violation of FDUPTA, Fla. Stat. § 501.204 (1).

370.     These acts and practices are unfair under the FTC's interpretation of Section 5(a)(1) of the Federal Trade Commission Act, as set forth in the FTC's Policy Statement on Unfairness.

371.     These acts and practices of Akorn violate established public policy as expressed, *inter alia*, by the FTC's Policy Statement on Unfairness.

372.     These acts and practices are unfair, in violation of the cited statutes, because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

373.     Akorn Plaintiffs and Akorn Class Members purchased prescription eye drops manufactured and sold by Akorn and thereby sustained damages as a result of Akorn's violations of FDUTPA.  Such damages were in the form of amounts that Akorn Plaintiffs and Class

Members paid for such pharmaceuticals that were wasted because the drops were larger than the capacity of the human eye.

374.    Such sums can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Akorn that exceeded a drop of 16 µL.  For example, if a Class Member paid for medication the drops of which were 32 µL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

375.    Akorn's actions, as alleged herein, were performed intentionally, willfully, knowingly, and maliciously.

376.    Injunctive relief is necessary and proper to compel Akorn to cease its unfair and unconscionable acts and practices, as alleged herein.

WHEREFORE, Akorn Plaintiffs pray for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT XVIII:  ICFA VIOLATIONS OF ALCON
### (Plaintiff Layloff)

377.    Plaintiff Layloff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

378.    The acts and practices of Alcon alleged herein are unfair in violation of Illinois Consumer Fraud & Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* ("ICFA"), in that they are unconscionable commercial practices in connection with the sale of merchandise.

379.    Plaintiff Layloff and Illinois Alcon Class Members suffered ascertainable loss of money or property as a result of Alcon's use or employment of methods, acts or practices declared unlawful under the ICFA.

380.    Plaintiff Layloff and Illinois Class Members purchased prescription eye drops manufactured and sold by Alcon and thereby sustained actual damage as a result of Alcon's violations of ICFA as alleged herein.  Such damages were in the form of amounts that Plaintiff Layloff and Illinois Class Members paid for such pharmaceuticals that were wasted because the drops were larger than the capacity of the human eye.

381.    Such sums can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Alcon that exceeded a drop of 16 µL.  For example, if a Class Member paid for medication the drops of which were 32 µL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

382.    Alcon's actions, as alleged herein, were performed intentionally, willfully, knowingly, and maliciously.

383.    Injunctive relief is necessary and proper to compel Alcon to cease its violations of ICFA, as alleged herein.

WHEREFORE, Plaintiff Layloff prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT XIX:  ICFA VIOLATIONS OF PFIZER
### (Plaintiff Layloff)

384.    Plaintiff Layloff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

385.    The acts and practices of Alcon alleged herein are unfair in violation of ICFA, 815 ILCS 505/1, *et seq.,* in that they are unconscionable commercial practices in connection with the sale of merchandise.

386.    Plaintiff Layloff and Illinois Alcon Class Members suffered ascertainable loss of money or property as a result of Alcon's use or employment of methods, acts or practices declared unlawful under the ICFA.

387.    Plaintiff Layloff and Illinois Class Members purchased prescription eye drops manufactured and sold by Alcon and thereby sustained actual damage as a result of Alcon's violations of ICFA as alleged herein.  Such damages were in the form of amounts that Plaintiff Layloff and Illinois Class Members paid for such pharmaceuticals that were wasted because the drops were larger than the capacity of the human eye.

388.    Such sums can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Alcon that exceeded a drop of 16 µL.  For example, if a Class Member paid for medication the drops of which were 32 µL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

389.    Pfizer's actions, as alleged herein, were performed intentionally, willfully, knowingly, and maliciously.

390.    Injunctive relief is necessary and proper to compel Pfizer to cease its violations of ICFA, as alleged herein.

WHEREFORE, Plaintiff Layloff prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT XX:  ALCON'S VIOLATIONS OF NCUDTPA
(Plaintiff Tate)

391.    Plaintiff Tate realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

392.     The acts and practices of Alcon alleged herein are unfair in violation of

NCDUPTA, N.C.G.S § 75-1.1, *et seq*., in that they are unfair

393.     These acts and practices are unfair under the FTC's interpretation of Section

5(a)(1) of the Federal Trade Commission Act, as set forth in the FTC's Policy Statement on

Unfairness.

394.     Plaintiff Tate and Alcon North Carolina Class Members purchased prescription

eye drops manufactured and sold by Alcon and thereby sustained damages as a result of Alcon's

violations of NCDUTPA.  Such damages were in the form of amounts that Plaintiff Tate and

Alcon North Carolina Class Members paid for such pharmaceuticals that were wasted because

the drops were larger than the capacity of the human eye.

395.     Such sums can be measured by the amounts they paid for that portion of topical

prescription ophthalmic medication in multi-use bottles manufactured and sold by Alcon that

exceeded a drop of 16 µL.  For example, if a Class Member paid for medication the drops of

which were 32 µL, the amount to which they are entitled to be restored is equal to half the

amount that he, she or it paid for the medication.

396.     Alcon's actions, as alleged herein, were performed intentionally, willfully,

knowingly, and maliciously.

397.     Injunctive relief is necessary and proper to compel Alcon to cease its unfair and

unconscionable acts and practices, as alleged herein.

WHEREFORE, Plaintiff Tate prays for the relief requested in the Prayer for Relief set

forth below in this Complaint.

## COUNT XXI:  ALLERGAN'S VIOLATIONS OF NCUDTPA
### (Plaintiff Tanner)

398.    Plaintiff Tanner realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

399.    The acts and practices of Allergan alleged herein are unfair in violation of NCDUPTA, N.C.G.S § 75-1.1, *et seq*., in that they are unfair

400.    These acts and practices are unfair under the FTC's interpretation of Section 5(a)(1) of the Federal Trade Commission Act, as set forth in the FTC's Policy Statement on Unfairness.

401.    Plaintiff Tanner and Allergan North Carolina Class Members purchased prescription eye drops manufactured and sold by Allergan and thereby sustained damages as a result of Allergan's violations of NCDUTPA.  Such damages were in the form of amounts that Plaintiff Tanner and Class Members paid for such pharmaceuticals that were wasted because the drops were larger than the capacity of the human eye.

402.    Such sums can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Allergan that exceeded a drop of 16 µL.  For example, if a Class Member paid for medication the drops of which were 32 µL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

403.    Allergan's actions, as alleged herein, were performed intentionally, willfully, knowingly, and maliciously.

404.    Injunctive relief is necessary and proper to compel Allergan to cease its unfair and unconscionable acts and practices, as alleged herein.

WHEREFORE, Plaintiff Tanner prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT XXII:  PFIZER'S VIOLATIONS OF NCUDTPA
### (Plaintiff Sutton)

405.    Plaintiff Sutton realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

406.    The acts and practices of Pfizer alleged herein are unfair in violation of NCDUPTA, N.C.G.S § 75-1.1, *et seq*., in that they are unfair

407.    These acts and practices are unfair under the FTC's interpretation of Section 5(a)(1) of the Federal Trade Commission Act, as set forth in the FTC's Policy Statement on Unfairness.

408.    Plaintiff Sutton and Pfizer North Carolina Class Members purchased prescription eye drops manufactured and sold by Pfizer and thereby sustained damages as a result of Pfizer's violations of NCDUTPA.  Such damages were in the form of amounts that Plaintiff Sutton and Pfizer North Carolina Class Members paid for such pharmaceuticals that were wasted because the drops were larger than the capacity of the human eye.

409.    Such sums can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Pfizer that exceeded a drop of 16 µL.  For example, if a Class Member paid for medication the drops of which were 32 µL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

410.    Pfizer's actions, as alleged herein, were performed intentionally, willfully, knowingly, and maliciously.

411.     Injunctive relief is necessary and proper to compel Pfizer to cease its unfair and unconscionable acts and practices, as alleged herein.

WHEREFORE, Plaintiff Sutton prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

### COUNT XXIII:  ALCON'S VIOLATIONS OF THE TEXAS DTPA
(Plaintiff Renteria)

412.     Plaintiff Renteria realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

413.     The acts and practices of Alcon alleged herein are unconscionable in violation of the Texas DTPA, Tex. Bus. & Com. Code § 17.50, *et seq*., in that they are acts that took advantage of the lack of knowledge, ability, experience, or capacity of Plaintiff Renteria and Texas Alcon Class Members to a grossly unfair degree, or which resulted in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration.

414.     Alcon's unconscionable acts were a producing cause of economic damages on the part of Plaintiff Renteria and Alcon Texas Class Members.

415.     Plaintiff Renteria and Alcon Texas Class Members purchased prescription eye drops manufactured and sold by Alcon and thereby sustained damages in the form of amounts that Plaintiff Renteria and Alcon Texas Class Members paid for such pharmaceuticals that were wasted because the drops were larger than the capacity of the human eye.

416.     Such sums can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Alcon that exceeded a drop of 16 µL.  For example, if a Class Member paid for medication the drops of

which were 32 μL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

417.    Written notice to Alcon pursuant to Tex. Bus. & Com. Code § 17.505 is impracticable by reason of the necessity of filing suit in order to prevent the expiration of the statute of limitations in that Plaintiff Renteria made a purchase of Alcon prescription eye drop product Travatan Z between April 2, 2012, and June 1, 2012, the claim for which would be time-barred by a 60-day delay in filing this Complaint.

418.    Alcon's actions, as alleged herein, were performed intentionally, willfully, knowingly, and maliciously.

419.    Injunctive relief is necessary and proper to compel Alcon to cease its unfair and unconscionable acts and practices, as alleged herein.

WHEREFORE, Plaintiff Renteria prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

### COUNT XXIV:  ALLERGAN'S VIOLATIONS OF THE TEXAS DTPA
(Plaintiff Franco)

420.    Plaintiff Franco realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

421.    The acts and practices of Allergan alleged herein are unconscionable in violation of the Texas DTPA, Tex. Bus. & Com. Code § 17.50, *et seq*., in that they are acts that took advantage of the lack of knowledge, ability, experience, or capacity of Plaintiff Franco and Texas Allergan Class Members to a grossly unfair degree, or which resulted in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration.

422.    Allergan's unconscionable acts were a producing cause of economic damages on the part of Plaintiff Franco and Allergan Texas Class Members.

423.    Plaintiff Franco and Allergan Texas Class Members purchased prescription eye drops manufactured and sold by Allergan and thereby sustained damages in the form of amounts that Plaintiff Franco and Allergan Texas Class Members paid for such pharmaceuticals that were wasted because the drops were larger than the capacity of the human eye.

424.    Such sums can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Allergan that exceeded a drop of 16 µL.  For example, if a Class Member paid for medication the drops of which were 32 µL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

425.    Written notice to Allergan pursuant to Tex. Bus. & Com. Code § 17.505 is impracticable by reason of the necessity of filing suit in order to prevent the expiration of the statute of limitations in that Plaintiff Franco made a purchase of Allergan prescription eye drop product Lumigan between April 2, 2012, and June 1, 2012, the claim for which would be time-barred by a 60-day delay in filing this Complaint.

426.    Allergan's actions, as alleged herein, were performed intentionally, willfully, knowingly, and maliciously.

427.    Injunctive relief is necessary and proper to compel Allergan to cease its unfair and unconscionable acts and practices, as alleged herein.

WHEREFORE, Plaintiff Franco prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## COUNT XXV:  VALEANT DEFENDANTS' VIOLATIONS OF THE TEXAS DTPA
### (Plaintiff Lampkin)

428.　　Plaintiff Lampkin realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged in this paragraph.

429.　　The acts and practices of the Valeant Defendants alleged herein are unconscionable in violation of the Texas DTPA, Tex. Bus. & Com. Code § 17.50, *et seq*., in that they are acts that took advantage of the lack of knowledge, ability, experience, or capacity of Plaintiff Lampkin and Texas Valeant Class Members to a grossly unfair degree, or which resulted in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration.

430.　　The Valeant Defendants' unconscionable acts were a producing cause of economic damages on the part of Plaintiff Lampkin and Valeant Texas Class Members.

431.　　Plaintiff Lampkin and the Valeant Texas Class Members purchased prescription eye drops manufactured and sold by the Valeant Defendants and thereby sustained damages in the form of amounts that Plaintiff Lampkin and Valeant Texas Class Members paid for such pharmaceuticals that were wasted because the drops were larger than the capacity of the human eye.

432.　　Such sums can be measured by the amounts they paid for that portion of topical prescription ophthalmic medication in multi-use bottles manufactured and sold by Valeant that exceeded a drop of 16 μL.  For example, if a Class Member paid for medication the drops of which were 32 μL, the amount to which they are entitled to be restored is equal to half the amount that he, she or it paid for the medication.

433.　　Written notice to Allergan pursuant to Tex. Bus. & Com. Code § 17.505 is impracticable by reason of the necessity of filing suit in order to prevent the expiration of the

statute of limitations in that Plaintiff Lampkin made a purchase of Valeant prescription eye drop product Latanoprost between April 2, 2012, and June 1, 2012, the claim for which would be time-barred by a 60-day delay in filing this Complaint.

434.    The Valeant Defendants' actions, as alleged herein, were performed intentionally, willfully, knowingly, and maliciously.

435.    Injunctive relief is necessary and proper to compel the Valeant Defendants to cease their unfair and unconscionable acts and practices, as alleged herein.

WHEREFORE, Plaintiff Lampkin prays for the relief requested in the Prayer for Relief set forth below in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes, pray judgment against Defendants as follows:

1.    Certifying the Classes and Subclasses as requested herein;

2.    Entering an order appointing The Law Office of Richard S. Cornfeld, The Simon Law Firm, P.C., and Aylstock, Witkin, Kreis & Overholtz, PLLC as lead counsel for the Classes and Cohn Lifland Pearlman Herrmann & Knopf LLP as liaison counsel;

3.    Awarding actual damages from each Defendant in an amount that together exceeds the aggregate sum of $5,000,000 to Plaintiffs and the members of the Classes and Subclasses;

4.    Awarding punitive damages against each Defendant as the court deems necessary or proper;

5.    Awarding treble damages as permitted by statute;

6.      Awarding declaratory and injunctive relief as permitted by law or equity

including a preliminary and permanent injunction enjoining Defendants from

continuing the unlawful practices as set forth herein;

7.      Awarding pre-judgment and post-judgment interest;

8.      Awarding reasonable attorneys' fees and costs herein;

9.      Awarding such other and further relief as the court deems fit and proper.


## JURY DEMAND

Plaintiff demands a trial by jury.


                              Respectfully submitted,

                              COHN LIFLAND PEARLMAN
                                HERRMANN & KNOPF LLP

                          By:  */s/ Jeffrey W. Herrmann*_____
                              Jeffrey W. Herrmann, Esq.
                              Park 80 West-Plaza One
                              250 Pehle Ave., Suite 401
                              Saddle Brook, NJ  07663
                              (201) 845-9600
                              (201) 845-9423 (Fax)
                              jwh@njlawfirm.com


LAW OFFICE OF RICHARD S. CORNFELD

    Richard S. Cornfeld
    1010 Market Street, Suite 1720
    St. Louis, MO  63101
    (314) 241-5799
    (314) 241-5788 (fax)
    rcornfeld@cornfeldlegal.com

and

THE SIMON LAW FIRM, P.C.

John G. Simon
    Ryan A. Keane
    800 Market Street, Suite 1700
    St. Louis, MO 63101
    (314) 241-2929
    (314) 241-2029 (Fax)
    jsimon@simonlawpc.com
    rkeane@simonlawpc.com

and

AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC

    Douglass Alan Kreis
    E. Samuel Geisler
    17 East Main Street, Suite 200
    Pensacola, Florida  32502-5996
    (850) 202-1010
    (850-916-7449 (Fax)
    dkreis@awkolaw.com
    SGeisler@awkolaw.com

*Attorneys for Plaintiff*

## CERTIFICATION OF NON-ARBITRABILITY PURSUANT TO L. CIV. R. 201.1

Jeffrey W. Herrmann, of full age, certifies that pursuant to L. Civ. R. 201.1 the within matter is not arbitrable, being that the Complaint seeks damages that are in an excess of $150,000.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on this 19th day of September, 2014.

                         *s/ Jeffrey W. Herrmann*
                         JEFFREY W. HERRMANN

**CERTIFICATION PURSUANT TO L. CIV. R. 11.2**

I certify that to the best of my knowledge, the matter in controversy is not currently

the subject of one other action pending in this court.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on this 19th day of September, 2014.

 s/ Jeffrey W. Herrmann        <br>
JEFFREY W. HERRMANN

# Appendix
# Bibliography

**Books**

1.   Clinical Ocular Pharmacology (Jimmy D. Bartlett and Siret D. Jaanus eds., Butterworth-Heinemann Elsevier 5th ed. 2008).

2.   J.J. Kanski, Clinical Ophthalmology:  A Systematic Approach (2007)

3.   Walt, J. and Alexander, F., *Drops, Drops, and More Drops*, in Glaucoma – Current Clinical and Research Aspects 197-222 (Pinakin Gunvant, ed. 2011).

4.   Drug Delivery and Targeting for Pharmacists and Pharmaceutical Scientists (A.M. Hillery, A.W. Lloyd and J. Swarbrick, eds. 2001).

**Articles**

1.   S.F. Ball et al., Cost of  B-Adrenergic Receptor Blocking Agents for Ocular Hypertension, 110 Arch. Ophthalmol. 654 (1992)

2.   S. Brian S, *et al*., *Pharmaceutical evaluation of the quality and delivered dose of US latanoprost generics*, Abstract presented at ARVO Annual Meeting, 2012.

3.   Brown, Reay H. *et al.*, *Creating Smaller Eyedrops by Reducing Eyedropper Tip Dimensions*, 99 Am. J. Ophthalmology 460-464 (1985).

4.   A. Cox, *Systemic Effects of Ocular Drugs*, 2002 Adverse Drug Reaction Bulletin 823.

5.   Charap, Arthur D.  *et al.*, *Effect of Varying Drop Size on the Efficacy and Safety of a Topical Beta Blocker*, 21 Ann. Ophthalmology 351-357 (1989).

6.   Chrai, Sukhbir S. *et al.*, *Lacrimal and Instilled Fluid Dynamics in Rabbit Eyes*, 62 J. Pharmaceutical Sci., 1112-1121 (1973).

7.   Fiscella, Richard G. *et al.*, *Cost Considerations of Medical Therapy for Glaucoma*, 128 Am. J. Ophthalmology 426-433 (1999).

**Appendix**
**Bibliography**

8.    Fiscella, Richard G. *et al.*, *Efficiency of Instillation Methods for Prostaglandin Medications*, 22 J. Ocular Pharmacology and Therapeutics 477-482 (2006).

9.    Fiscella, Richard G. *et al.*, *Medical Therapy Cost Considerations for Glaucoma*, 136 Am. J. Ophthalmology 18-25 (2003).

10.   Ghate, Deepta and Henry F. Edelhauser, *Barriers to Glaucoma Drug Delivery*, 17 J. Glaucoma 147-156 (2008).

11.   Hartenbaum, David *et al*., *Quantitative and Cost Evaluation of Three Antiglaucoma Beta-Blocker Agents:  Timoptic-XE® versus Two Generic Levobunolol Products*, 2 Am. J. Managed Care 157-162 (1996).

12.   Lederer, Charles M. and Ralph E. Harold, *Drop Size of Commercial Glaucoma Medications*, 101 Am. J. Ophthalmology 691-694 (1986).

13.   Lynch, M., *Reducing the Size and Toxicity of Eyedrops*, in Eye Research Seminar, Ed: Research to Prevent Blindness, New York, 20-21, (1988).

14.   Lynch, Mary G. *et al.*, *Reduction of Phenylephrine Drop Size in Infants Achieves Equal Dilation with Decreased Systemic Absorption*, 105 Arch Ophthalmology 1364-1365 (1987).

15.   Mammo, Zaid N.  *et al., Generic Versus Brand-Name North American Topical Glaucoma Drops*, 47 Can. J. Ophthalmology 55-61 (2011).

16.   Patton, Thomas F., *Pharmacokinetic Evidence for Improved Ophthalmic Drug Delivery by Reduction of Instilled Volume*, 66 J. Pharmaceutical Sci. 1058-1059 (1977).

17.   Petursson, Gissur *et al.*, *Treatment of Glaucoma Using Minidrops of Clonidine*, 102 Arch Ophthalmology 1180-1181 (1984).

**Appendix**
**Bibliography**

18. Rylander, Nathan R. and Steven D. Vold, *Cost Analysis of Glaucoma Medications*, 145 <u>Am. J. Ophthalmology</u> 106-113 (2008).

19. Van Santvliet, L. *et al.*, *The Influence of Penetration Enhancers on the Volume Instilled of Eye Drops*, 45 <u>Eur. J. Pharmaceutics and Biopharmaceutics</u> 189-198 (1998).

20. Van Santvliet, L. *et al.*, *Influence of the physico-chemical properties of ophthalmic viscolysers on the weight of drops dispensed from a flexible dropper bottle*, 7 Eur. J. Pharm. Sci. 339 (1999).

21. Van Santvliet, L. *et al.*, *Dispensing Eye Drops from Flexible Plastic Dropper Bottles. Part II: Influence of the physico-chemical properties of the formulation and the manipulation technique by the patient*, 61 Pharm. Ind. 194 (1999).

22. Van Santvliet, L. *et al.*, *Influence of the Dropper Tip design on the Size of Eye-drops*, 63 Pharm. Ind. 402 (2001).

23. Van Santvliet, L. *et al.*, *Determinants of Eye Drop Size*, 49 <u>Surv. Ophthalmology</u> 197-213 (2004).

24. Ventura, M. P. *et al.*, *Cost Considerations of the New Fixed Combinations for Glaucoma Medical Therapy*, 30 <u>J. of Clinical Pharmacy and Therapeutics</u> 251-254 (2005).

25. Vocci, Mark J., *Reformulation and Drop Size of Apraclonidine Hydrochloride*, 113 <u>Am. J. Ophthalmology</u> 154-160 (1992).